

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-29-1997

# RNS Ser Inc v. Secretary Labor

Precedential or Non-Precedential:

Docket 96-3245

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"RNS Ser Inc v. Secretary Labor" (1997). *1997 Decisions.* Paper 115.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/115

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 29, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-3245

RNS SERVICES, INC.,

Petitioner

v.

SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION (MSHA), and FEDERAL MINE SAFETY
AND HEALTH REVIEW COMMISSION,

Respondents

Amended per Clerk order 6/4/96

On Petition for Review of a Final Order of the
Federal Mine Safety and Health Review Commission
(Nos. PENN 95-382-R and 95-383-R)

Argued January 6, 1997

BEFORE: GREENBERG, COWEN and ALITO,
Circuit Judges

(Filed May 29, 1997)

R. Henry Moore, Esq. (Argued)
Heather A. Wyman, Esq.
Buchanan Ingersoll Professional
 Corporation
One Oxford Centre
301 Grant Street
20th Floor
Pittsburgh, PA 15219-1410

Counsel for Petitioner
RNS Services, Inc.

Colleen A. Geraghty, Esq.
Jerald S. Feingold, Esq. (Argued)
United States Department of Labor
Office of the Solicitor
4015 Wilson Boulevard
Arlington, VA 22203

Counsel for Respondent
Secretary of Labor, Mine
Safety and Health Administration
(MSHA)

**OPINION OF THE COURT**

COWEN, <u>Circuit Judge</u>.

RNS Services, Inc. ("RNS") petitions for review of an order of the Federal Mine Safety and Health Review Commission ("the Commission"). While not contesting the merits of the Commission's decision, RNS claims that the Federal Mine Safety and Health Administration ("MSHA") lacks jurisdiction over its No. 15 Refuse Pile ("the Site") in Barr Township, Pennsylvania. In order for jurisdiction to be present, the governing statute requires that coal be processed at the Site in acts constituting "the work of preparing the coal." 30 U.S.C. § 802(I)(1988). RNS contends that the MSHA (and the Commission) lack jurisdiction because the Site is not one at which "the work of preparing the coal" occurs and the material handled at the Site is not

2

pure coal. We conclude that RNS's interpretation of the statute is incorrect and we will affirm.

## I. Facts and Procedural History

This is the review of a final order of the Commission. The case arises out of two citations issued by the Secretary of Labor (acting through the MSHA) to RNS under Title I, Section 104(a) of the Federal Mine Safety and Health Act, 30 U.S.C. § 814(a)("the Act" or "the Mine Act"). The citations alleged that RNS failed to record the results of the daily examination of the Site, in violation of 30 C.F.R. § 77.1713(c), and failed to have a ground control plan for the Site, in violation of the safety standard at 30 C.F.R. § 77.1000. RNS did not contest the facts of the violations as cited, but instead challenged the Commission's jurisdiction over the Site. RNS asserted that MSHA lacked jurisdiction because the Site was not a "mine" as that term is defined in Section 3(h)(1) of the Mine Act, 30 U.S.C. § 802(h)(1). RNS lodged its challenge pursuant to 30 U.S.C. § 815(a).

After conducting an expedited evidentiary hearing pursuant to 30 U.S.C. § 815(d), an administrative law judge agreed with petitioners. The ALJ held that the Site was not a "mine" and, therefore, not subject to MSHA jurisdiction. On petition to the Commission for discretionary review pursuant to 30 U.S.C. § 823(d)(1)(B), the Commission reversed the decision of the ALJ and held that the loading and transportation of coal that occurred at the Site were sufficient to render the Site a "mine" under 30 U.S.C. § 802. RNS petitions for review.

## II. 30 U.S.C. Section 802

### A. "Work of Preparing the Coal"

The Mine Act explains that "[a] `coal or other mine' means an area of land . . . used in . . . the work of preparing the coal . . . ." 30 U.S.C. § 802(h)(1). Accordingly, a "coal mine" is a site at which, inter alia, "the work of preparing the coal" usually occurs. 30 U.S.C. § 802(I). The Act delineates activities that constitute "the work of preparing the coal":

3

`work of preparing the coal' means the breaking, crushing, sizing, cleaning, washing, drying, mixing, <u>storing</u>, and <u>loading</u> of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine.

<u>Id.</u>

Turning to the case law, in <u>Pennsylvania Elec. Co. v. Federal Mine Safety and Health Review Comm'n</u> ("<u>Penelec</u>"), we held that "the delivery of raw coal to a coal processing facility is an activity within the Mine Act, but not the delivery of completely processed coal to the ultimate consumer." 969 F.2d 1501, 1504 (3d Cir. 1992)(citing <u>Stroh v. Director, Office of Workers' Comp. Progs.</u>, 810 F.2d 61, 64 (3d Cir. 1987)). <u>See also Hanna v. Director, Office of Workers' Comp. Progs.</u>, 860 F.2d 88, 92-93 (3d Cir. 1988). In <u>Stroh</u>, we found that "shovel[ing coal] into [a] truck, and haul[ing] it to independently owned coal processing plants" was integral to the work of preparing the coal. <u>Id.</u> at 62. We further noted that the loaded coal's subsequent transportation over public roads did not alter its status as an activity that is part of the work of preparing the coal. <u>Id.</u> at 65.

<u>Penelec</u> applied a functional analysis, wherein the propriety of Mine Act jurisdiction is determined by the nature of the functions that occur at a site. That analysis has its roots in <u>Wisor v. Director, Office of Workers' Comp. Progs.</u>, 748 F.2d 176, 178 (3d Cir. 1984), was applied in <u>Stroh</u>, 810 F.2d at 64, and has been adopted by the Fourth Circuit. <u>See United Energy Servs., Inc. v. Federal Mine Safety & Health Admin.</u>, 35 F.3d 971, 975 (4th Cir. 1994).

In the instant case, loading, the principal function that occurs at the Site, is an activity specifically listed in the Act as constituting "the work of preparing the coal." 30 U.S.C. § 802(I). The petitioner asserts that the Commission mistakenly made a <u>per se</u> ruling that whenever loading is present at a site at which coal is handled, that site is a "mine." We do not find that the Commission has made such a <u>per se</u> ruling. Instead, the Commission took note that at the Site, coal is in fact loaded, at a place regularly used for that purpose, in preparation for further processing. The

4

Commission concluded that the plain meaning of the statute and the relevant case law made clear that these activities were sufficient to render the situs of these activities a "mine."1

_____

1. We hold that the only reasonable interpretation of the Commission's holding in the instant case is that MSHA appropriately exercises jurisdiction over a location in which coal is loaded in preparation for further processing. In its decision, the Commission noted that the processing occurred at the Site "[p]ursuant to a long-term contract." App. at 524. The Commission also recited the relevant statutory language, "as is usually done by the operator of the coal mine." App. at 527. Further, the Commission framed the key question as "whether the few activities that do take place at the No. 15 pile are sufficient to bring that site under the jurisdiction of the Mine Act." App. at 528. In reviewing the propriety of MSHA jurisdiction, the Commission considered only the work that "is usually done by the operator of the coal mine," i.e., "loading." App. at 527. In short, the Commission found that a limited range of coal-processing activities regularly occurred at the Site. App. at 528. To paraphrase National R.R. Passenger Corp. v. Boston and Maine Corp., 503 U.S. 407, 420, 112 S.Ct. 1394, 1403 (1992), we believe that the Commission's failure to explicitly state in one sentence that the MSHA had jurisdiction because "loading" was the activity that "usually occurr[ed]" at the Site "does not require a remand under those circumstances."

We further note that Justice Frankfurter explained in Securities and Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459 (1943), that the Court's concern in that case was that federal courts not "intrude upon the domain which Congress has exclusively entrusted to an administrative agency" in situations where "an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made." In the instant case, no factual or other determination that Congress sought to "exclusively entrust" to the Commission is being intruded upon by the courts. Rather, 30 U.S.C. § 816(a), "Judicial Review of Commission Orders," specifically explains that

the court shall have exclusive jurisdiction of the proceeding and the questions determined therein, and shall have the power to make and enter upon the pleadings, testimony, and proceedings set forth in such record a decree affirming, modifying, or setting aside, in whole or in part, the order of the Commission and enforcing the same to the extent that such order is affirmed or modified. . . . The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.

5

The Commission was cognizant that the coal refuse is loaded at the Site for delivery to "the Cambria Co-Generation Facility (Cambria) in Ebensburg, Pennsylvania, which generates electricity and steam. The material supplied by RNS to Cambria is broken and sized at Cambria's facility." Op. of the ALJ, RNS App. at 7. The coal is delivered from the Site to Cambria, where it is further prepared before reaching a form useable by its ultimate consumer. The storage and loading of the coal is a critical step in the processing of minerals extracted from the earth in preparation for their receipt by an end-user, and the Mine Act was intended to reach all such activities. Moreover, as the Commission noted, we have already adjudicated the activities that occur at the Cambria plant to be "the work of preparing the coal." Air Products & Chemicals, Inc. v. Secretary of Labor, Mine Safety and Health Admin., 15 F.M.S.H.R.C. 2428 (Dec. 1993), aff'd, 37 F.3d 1485 (3d Cir. 1994). It follows logically that the handling of the coal at the Site in order that it may be readied for subsequent processing at Cambria also constitutes "the work of preparing the coal."

The list of items indicative of "the work of preparing the coal" enumerated in the Mine Act is by no means exclusive. This is demonstrated by the additional phrase "and such other work of preparing such coal as is usually done by the operator of the coal mine." It is noteworthy that this sentence does not say, "[work] usually done by the operator of a coal mine," as RNS states in its brief. RNS Br. at 15 (emphasis added). If it did, one might have to compare the activities at the alleged coal mine with those of a typical, paradigmatic, "usual" coal mine. The sentence as it actually appears in the statute, however, does not help RNS. It simply explains that the work of the coal mine is the work that is usually done in that particular place. The fact that the Site is perhaps an unconventional coal mine does not defeat its status as a coal mine for the purposes of section 802.

**B. Purity of the Coal**

With regard to the issue of whether the mineral composite removed from the Site is in fact coal, the ALJ

made a factual finding that "[t]esting of material removed from the pile indicates that it shows the characteristics of coal." Op. of the ALJ, RNS App. at 8. We have no reason to believe that the ALJ's findings were clearly erroneous.

In addition, the statute gives no indication that it is concerned only with coal in forms that are pure or nearly so. The statute regulates "coal or other mines," so it plainly is not concerned solely with traditional coal. 30 U.S.C. § 802(h)(1). In Marshall v. Stoudt's Ferry Preparation Co., 602 F.2d 589, 592 (3d Cir. 1979), we held that the operations of a preparation company that separated a low-grade fuel from sand and gravel that had been dredged from a riverbed came within the Act. It was immaterial that the company processed "dredged refuse": "[T]he company's process of separating from the dredged refuse a burnable product . . . which was then sold as a low-grade fuel," placed that work within the definition of "coal preparation" and thus made the operation a "mine." Id.

## C. "Coal or Other Mine"

In section 802(h)(1), "coal or other mine" is defined directly:

(A) an area of land from which minerals are extracted in nonliquid form . . . , (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels, and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority

7

with respect to the health and safety of miners
employed at one physical establishment.

(emphasis added).

We find that this section is so expansively worded as to
indicate an intention on the part of Congress to authorize
the Secretary to assert jurisdiction over any lands integral
to the process of preparing coal for its ultimate consumer.2
As the Commission noted in its decision reversing the ALJ,
"[t]he definitions of coal mine and coal preparation in
sections 3(h) and 3(I) [codified at 30 U.S.C. §§ 802(h)(1) and
(I)] are `broad[,]' `sweeping,' and `expansive.' " RNS App. at
17 (quoting Stoudt's Ferry, 602 F.2d at 591-92). Since the
Site was used in preparing the coal for its further
processing at the Cambria plant, the activity was within the
sweep of the statute.

The Site seems to be specifically described in the statute
by such words as "impoundments" (storage facilities), and
"custom coal preparation facilities," since it serves a
specialized purpose in a larger coal-processing operation.
The sweeping inclusion of "lands," "slopes," and "other
property" further indicates Congress's plain intention that
the Commission have broad jurisdiction over locations at
which coal is processed.

Finally, we note that the Site may independently fall
under the jurisdiction of the MSHA as a "land[ ] . . .
resulting from[ ] the work of extracting such minerals from
their natural deposits in nonliquid form . . . ." 30 U.S.C.

_____

2. The dissent, with its "basement bin" example, overlooks our holding
(in the instant case and prior cases) that the MSHA has jurisdiction only
over locations in which, inter alia, coal undergoes processing that
prepares the coal for its ultimate use. See also Penelec, 969 F.2d at 1504
("the delivery of completely processed coal to the ultimate consumer" is
not "an activity within the Mine Act"); Stroh, 810 F.2d at 64 (for
jurisdiction to attach, the coal at issue must not yet be "a finished
product in the stream of commerce". For purposes of determining MSHA
jurisdiction under 30 U.S.C. § 802(i), therefore, the "work of preparing
such coal as is usually done by the operator of the coal mine" cannot
include the handling of coal that is in finished form and in the
possession of its ultimate consumer, as it would be in the dissent's
"basement bin."

8

§ 802(h)(1). The Secretary has not raised this argument on appeal, however, and we leave its adjudication for another day.

## D. Purposes of the Act

When reading the Act, we are mindful that "[t]he canons of statutory construction teach us to construe such remedial legislation broadly, so as to effectuate its purposes." Stroh, 810 F.2d at 63. As set forth in section 101, "Congressional findings and declaration of purpose," the Mine Act was passed in large part to bolster the powers of the federal government to regulate the effects of mining operations on health and safety:

Congress declares that--

(a) the first priority and concern of all in the coal or other mining industry must be the safety and health of its most precious resource--the miner. . . .

(g) it is the purpose of this chapter (1) . . . to direct the . . . Secretary of Labor to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the Nation's coal or other miners; (2) to require that each operator of a coal or other mine and every miner in such mine comply with such standards . . . .

30 U.S.C. § 801.

Congress was sufficiently concerned about the health and safety conditions at mines that, as was stated in Air Products, "[u]nder the Mine Act, enforcement is not left to the MSHA's discretion. Section 103(a) [codified at 30 U.S.C. § 813(a)] requires the agency to inspect all surface mines in their entirety at least twice a year." 15 F.M.S.H.R.C. at 2436 n.2. (Commissioner Doyle, concurring).

In the instant case, the Commission has legitimate concerns about worker safety and health at the Site. True potential hazards arise from the fact that part of the Site is banked; there are concerns about fire safety and the composition and circulation of dust at the Site. Tripping and stumbling are additional hazards. Audio Tape of Oral

9

Argument (Jan. 6, 1997)(on file with the Clerk, U.S. Court of Appeals for the Third Circuit).

Guided by the declaration of purpose in section 101 and the need to read remedial statutes broadly, we do not read this statute to be facially ambiguous concerning the propriety of the Commission's jurisdiction over the Site. The plain meaning of the statute is evident on its face. To upset this plain meaning by appealing to an extrinsic source, appellants must carry a high burden: "[C]lear statutory language place[s] an extraordinarily heavy burden on the party who seeks to vary it by reference to legislative history." Paskel v. Heckler, 768 F.2d 540, 543 (3d Cir. 1985). See also Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 482 (1984)("[O]nly the most extraordinary showing of contrary intentions" justifies altering the plain meaning of a statute.).

Here, a look at the legislative history does not bolster appellant's position; on the contrary, it confirms the position of the Secretary of Labor. The Senate report indicates that a principal reason for passing the Act and amending the predecessor Coal Act was to expand jurisdiction:

[I]ncluded in the definition of `mine' are lands, excavations, shafts, slopes, and other property, including impoundments, retention dams, and tailings ponds. These latter were not specifically enumerated in the definition of mine under the [predecessor] Coal Act. It has always been the Committee's express intention that these facilities be included in the definition of mine and subject to regulation under the Act, and the Committee here expressly enumerates these facilities within the definition of mine in order to clarify its intent. . . . [The Committee is greatly concerned that [at the time of a recent accident affecting an unstable dam] the scope of the authority of the Bureau of Mines . . . was questioned. Finally, the structures on the surface or underground, which are used or are to be used in or resulting from the preparation of the extracted minerals are included in the definition of `mine'. The Committee notes that there may be a need to resolve jurisdictional conflicts, but it is the

10

Committee's intention that what is considered to be a mine and to be regulated under this Act be given the broadest possibl[e] interpretation, and it is the intent of this Committee that doubts be resolved in favor of inclusion of a facility within the coverage of the Act.

S.Rep. No. 95-181, at 14 (1977), reprinted in 1977 U.S.C.C.A.N. 3401, 3414 (emphasis added).

We conclude, therefore, that the legislative history clearly shows that expansive jurisdiction was intended.

## III. Conclusion

It is clear to us that the April 22, 1996, decision of the Commission is in accord with the intent of Congress. For the foregoing reasons, the Petition for Review of the Order of the Federal Mine Safety and Health Review Commission will be denied.

Costs taxed against petitioner.

11

ALITO, Circuit Judge, dissenting:

As I interpret the decision of the Federal Mine Safety and Health Review Commission, it held that RNS was engaged in the "work of preparing the coal" at the site in question because RNS there performed one of the specific activities listed in 30 U.S.C. § 802(i). The majority does not share the Commission's view that the mere performance of any listed specific activity suffices. Rather, the majority holds that RNS was engaged in the "work of preparing the coal" at the site because it there performed a listed activity on a regular basis. I disagree with both the Commission's and the majority's view of the law. But even if the majority's view of the law is correct, the rule of SEC v. Chenery, 318 U.S. 80 (1943), mandates a remand to the Commission. I therefore dissent from the majority's denial of review.

I.

The Secretary's exercise of jurisdiction was proper if RNS was engaged at the site in "the work of preparing coal." 30 U.S.C. § 802(h)(1). Title 30 U.S.C. § 802(i) defines the "work of preparing the coal" as "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine." It is undisputed that RNS "loaded" coal at the site for transportation to the Cambria facility.

In my view, the Commission believed that it was required by our decision in Pennsylvania Electric Co. v. FMSHRC, 969 F.2d 1501 (3d Cir. 1992) ("Penelec"), to hold that RNS was engaged in the "work of preparing the coal" at the site if RNS performed at the site any of the activities listed in 30 U.S.C. § 802(i), regardless of the circumstances. The Commission held that "[u]nder the functional analysis of Penelec, each of the activities listed in [§ 802(i)] subjects anyone performing that activity to the jurisdiction of the Mine Act . . . ." (App. 18a-19a) (emphases added) (quoting Air Products and Chemicals, Inc. v. Secretary of Labor, MSHA, 15 FMSHRC 2428, 2435, 1993 WL 525480, aff'd, 37 F.3d 1485 (3d Cir. 1994) (Table)). The Commission did not ask whether RNS loaded coal on one occasion or on a

12

daily basis, or whether such loading was the type of "work of preparing such coal as is usually done by the operator of the coal mine." The Commission's decision was based solely on the fact that RNS loaded coal at the site. Indeed, the Commission noted that RNS's activities were "de minimis," App. 19a; one of the five members expressly stated that she concurred "solely because [she was] constrained to [do so] by the opinion" of this court in Penelec (App. 21a); and another member "question[ed] the wisdom of MSHA's expenditure of scarce government resources to inspect a pile of coal waste that has lain dormant for decades where the only activities are loading and hauling to a power plant for further processing." (App. 19a)

The Commission's belief that anyone who performs any listed activity under any circumstances is subject to MSHA jurisdiction becomes even clearer when one examines Air Products, the case that the Commission quoted in articulating its holding in the instant case. See App. 19a. In Air Products, the Commission held that a company was engaged in "the work of preparing coal" because it "perform[ed] some of the coal preparation activities listed in [§ 802(i)]." 15 FMSHRC at 2431. One member stated that she was constrained to concur by Penelec, which she interpreted to mean that "each of the activities listed in [§ 802(i)] wherever and by whomever performed and irrespective of the nature of the operation, subjects anyone performing that activity to the jurisdiction of the Mine Act . . . ." Id. at 2435 (emphasis added). A dissenting member would have rejected Penelec, which she viewed as holding that "a coal consumer becomes a coal preparation facility . . . by engaging in any of the activities listed in [§ 802(i)]. . . . The Third Circuit's decision in effect requires MSHA to inspect all facilities performing any of the coal preparation activities listed under [§ 802(i)]." Id. at 2437-38.

As I explain below, I disagree with the Commission's interpretation of Penelec. For present purposes, however, the important point is that the majority disagrees with the Commission's view of the law as well. Rather than holding, as the Commission did, that the mere performance of any listed activity is sufficient to subject anyone performing it to the Mine Act, the majority interprets the "as is usually

13

done" clause to require that such activity "usually occur[ ]" at the site in question. Maj. Op. at 3. In the majority's view, the "as is usually done" clause "explains that the work of the coal mine is the work that is usually done in that particular place." Maj. Op. at 6. The majority thus relies on the fact that "at the Site, coal is in fact loaded, <u>at a place regularly used for that purpose</u> . . . ." Maj. Op. at 4 (emphasis added).

Whether or not this is the correct interpretation of the "as is usually done" clause (I believe it is not), it is not the interpretation upon which the Commission relied. As a court reviewing the decision of an administrative agency, we may not uphold the Commission's decision "on grounds other than those relied upon by the agency." <u>National Railroad Passenger Corp. v. Boston and Maine Corp.</u>, 503 U.S. 407, 420 (1992) (citing <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 88 (1943)). If the Commission reached a result that we believe to be correct, but relied upon an incorrect view of the law in so deciding, we are obligated to remand to allow the Commission to reconsider its decision under the correct legal standard. <u>E.g.</u>, <u>Slaughter v. NLRB</u>, 794 F.2d 120, 128 (3d Cir. 1986).

Here, in order to escape <u>Chenery</u>, the majority mischaracterizes the Commission's decision. The majority notes that RNS "asserts that the Commission mistakenly made a <u>per se</u> ruling that whenever loading is present at a site at which coal is handled, that site is a mine." Maj. Op. at 4. This is, in fact, RNS's principal argument. The majority then declares that "[w]e do not find that the Commission has made such a <u>per se</u> ruling. Instead, the Commission took note that at the Site, coal is in fact loaded, at a place regularly used for that purpose .. . ." Maj. Op. at 4. This is simply wrong: the Commission did not even hint that its decision was based to any extent on the fact that loading regularly occurred at the site.[1] As I

_____

1. The majority points out (Maj. Op. at 5 n.1) that the Commission noted that RNS had entered into a "long-term contract." It is plainly unreasonable to read this passing reference to mean that the Commission's decision rested on the fact that loading occurred regularly at the site.

14

explained above, the Commission based its decision on the bare fact that RNS performed a listed activity at the site. In finding MSHA jurisdiction, the Commission gave no indication that it believed that anything other than that bare fact was required.

I therefore believe that the majority opinion denies RNS's petition for a reason not relied upon by the Commission. Because this court lacks the power to do what the majority has done, I would be obligated to dissent even if I agreed with the majority's view of the law.[2]

II.

In addition to diverging improperly from the Commission's rationale, the majority's holding is incorrect

_____

2. This is not a case in which the Commission came to "a conclusion to which it was bound to come as a matter of law, albeit for the wrong reason." See e.g., United Video, Inc. v. Federal Communications Commision, 890 F.2d 1173, 1190 (D.C. Cir. 1989). In order to uphold MSHA jurisdiction under the majority's interpretation, a determination must be made that loading is "usually" done at the site in question. It may well be that loading occurred at the site with some frequency from May 1995 through June 16, 1995, when the challenged citations were issued, but I cannot say based on the record that the Commission was bound to come to the conclusion that loading was an activity "usually" done at the site. We do not know for sure what occurred between May 1995 and June 16, 1995; nor is it clear that the Commission would be bound to limit its consideration to this brief period. That the agency would most likely reach the same decision on remand is no reason not to follow Chenery and its progeny. As we explained in Slaughter:

Where the agency has rested its decision on an unsustainable reason, the court should generally reverse and remand even though it discerns a possibility, even a strong one, that by another course of reasoning the agency might come to the same result. . . . [T]he process, even though it may appear wasteful as regards the case at hand, is important for the proper execution of the legislative will, since proceeding on the right path may require or at least permit the agency to make qualifications and exceptions that the wrong one would not.

794 F.2d at 128 (quoting Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 197, 222-23).

15

on its own terms. As previously noted, the site at issue was a "mine" if RNS was there engaged in "the work of preparing coal," 30 U.S.C. § 802(h)(1), which is defined to mean:

the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine.

30 U.S.C. § 802(i).

In interpreting this definition, it is important to decide whether the "as is usually done" clause modifies only the phrase that it immediately follows ("such other work of preparing such coal") or whether it also modifies all of the numerous specific activities ("breaking, crushing, sizing," etc.) that come before. It seems to me that the most natural reading of the language of this provision is that the "as is usually done" clause modifies only the phrase "such other work of preparing such coal," but this interpretation would extend MSHA jurisdiction to unreasonable lengths. For example, under this interpretation "storing" coal would always constitute the "work of preparing the coal," and therefore any site where "storing" occurred (including, presumably, any basement with a coal bin) would be a "mine" subject to MSHA jurisdiction. The MSHA would be required to inspect the basement twice per year (and could do so without a warrant). See 30 U.S.C. §§ 813(a), 814(d); Donovan v. Dewey, 452 U.S. 594 (1981). Such a result would, in my view, be "demonstrably at odds" with congressional intent. Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982). Indeed, even the Secretary acknowledges that MSHA jurisdiction does not extend this far. See Sec'y Br. at 12 n.3 ("to establish coal preparation activity . . . every . . . activity specifically enumerated in [§ 802(i)] must be activity `such as is usually done by the operator of a coal mine.' "). See also id. at 13.

In addition, interpreting the "as is usually done" clause as modifying only the phrase "such other work of preparing the coal" would lead to results that conflict with our prior cases. It is well settled in this circuit and elsewhere that

16

"the delivery of completely processed coal to the ultimate consumer" does not fall within the Act. Penelec, 969 F.2d at 1504 (citing Stroh v. Director, OWCP, 810 F.2d 61, 64 (3d Cir. 1987)). Accord United Energy Services, Inc. v. Fed. Mine Safety & Health Adm., 35 F.3d 971, 975 (4th Cir. 1994). But this proposition cannot stand if the mere performance of any activity listed in § 802(i) is enough to bring the site within MSHA jurisdiction. As noted, "storing" is among the specific activities listed, and ultimate consumers who receive deliveries of fully processed coal almost always store at least some of that coal before burning it. It is noteworthy that the Secretary appears to recognize the danger of such a conflict. Her brief expressly requests the adoption of a rule of law limiting § 802(i) to activities involving coal that "has not yet reached a form that is completely processed and fully ready for its ultimate use." Sec'y Br. at 24.

For these reasons, I would hold -- contrary to the position that the Commission seems to me to have taken in its decision in this case -- that, in order to constitute the work of preparing coal, any activity listed in 30 U.S.C. § 802(i) must be an activity such "as is usually done by the operator of the coal mine."

It is thus important to determine what the "as is usually done" clause means. The majority here takes the position that the clause means simply that the activity in question ("breaking, crushing, sizing," etc.) must be an activity that is regularly performed at the site. See Maj. Op. at 6 ("The sentence [in 30 U.S.C. § 802(i)] simply explains that the work of the coal mine is the work that is usually done in that particular place.").

I strongly disagree with this interpretation, which was not advocated by either party in this case, and is not supported by any cited judicial or administrative authority. This interpretation again extends MSHA jurisdiction to an unreasonable degree that Congress cannot have intended. According to the majority's interpretation, any place where any activity listed in 30 U.S.C. § 802(i) regularly occurs must be a coal mine. Therefore, any place where coal is regularly stored must be a coal mine, and consequently the basement with the coal bin must be subjected to MSHA jurisdiction, provided only that such storage is an activity

17

"that is usually done in that particular place." Maj. Op. at 6.3

RNS offers a more reasonable interpretation of the "as is usually done" clause. RNS contends that "as is usually done by the operator of the coal mine" means as is done by the typical coal mine operator. Thus, under this interpretation, "storing" must be the type of storing that is done by the typical coal mine operator -- and not by the homeowner with a basement bin.

The majority rejects this argument based on a punctilious interpretation of word "the" in the phase "operator of the coal mine." 39 U.S.C.§ 802(i) (emphasis added). The majority writes:

It is noteworthy that this sentence does not say,[work] usually done by the operator of a coal mine, as RNS states in its brief. If it did, one might have to compare the activities at the alleged coal mine with those of a typical, paradigmatic, usual coal mine. The sentence as it actually appears in the statute, however, does not help RNS. It simply explains that the work of the coal mine is the work that is usually done in that particular place. The fact that the Site is perhaps an unconventional coal mine does not defeat its status as a coal mine for the purposes of section 802.

Maj. Op. at 6. (emphasis and emendation in original) (citation omitted).

The majority is quick to take RNS to task for changing the statutory "the" into an "a," but the majority overlooks the fact that RNS has plenty of company. Many cases, including several from this court, have written this clause with an "a" instead of a "the." See Penelec, 969 F.2d at 1503; Hanna v. Director, OWCP, 860 F.2d 88, 92 (3d Cir. 1988); Wisor v. Director, OWCP, 748 F.2d 176, 178 (3d Cir.

_____

3. The majority states that a basement coal bin is not subject to MSHA jurisdiction because "the MSHA has jurisdiction only over locations in which, inter alia, coal undergoes processing that prepares the coal for its ultimate use." Maj. Op. at 8 n.2. But how the majority can square this rule with its interpretation of the "as is usually done" clause is a mystery.

18

1984); Fox v. Director, OWCP, 889 F.2d 1037, 1040 (11th Cir. 1989); Air Products, 15 FMSHRC at 2431; Penelec, 969 F.2d at 1509 (Mansmann, J., dissenting) ("the preparation at issue must be of a type usually performed by a coal mine operator") (citing Secretary of Labor v. Pennsylvania Electric Co., 11 FMSHRC 1875, 1880 (1989) and Secretary of Labor v. Oliver M. Elam, Jr., Co., 4 FMSHRC 5, 7 (1982)).4 Moreover, the Secretary's brief in this case treats § 802(i) as if it read "a" instead of "the". See Sec'y Br. at 12 n.3 ("Both the Secretary and the Commission acknowledge that to establish coal preparation activity, loading, like every other activity specifically enumerated in [§ 802(i)] must be activity `such as is usually done by the operator of a coal mine."); id. at 13.5 In addition, the Commission in Air Products wrote this provision as "as is usually done by the operator of [a] coal mine." 15 FMSHRC at 2430-31 (emendation in original). All of these authorities, it seems to me, support RNS's interpretation. All of them appear tacitly to acknowledge that, although Congress used the word "the," its intended meaning would have been more clearly expressed had it used the word "a." While this interpretation may not be the most literal reading of the statutory language, it seems to me to represent the best we can do with the unfortunately worded provision that confronts us.

Whether RNS's activities in loading the coal and transporting it to Cambria are the type of work usually done by a coal mine operator is a factual question that the Commission has not addressed. I would therefore grant RNS's petition for review and remand to allow the Commission to decide this question.

_____

4. In Oliver M. Elam, one of the cases cited by Judge Mansmann in her Penelec dissent, the Commission opined that "inherent in the determination of whether an operation properly is classified as `mining' is an inquiry not only into whether the operation performs one or more of the listed work activities, but also into the nature of the operation performing such activities." 4 FMSHRC at 7.
5. While the Secretary's brief does not say so in so many words, her unacknowledged changing of the "the" to "a" is consistent with, indeed required by, her recognition that the Act does not extend to activities involving coal that is "completely processed and fully ready for its ultimate use." Sec'y Br. at 24.

19

III.

As explained in Part I, the Commission appears to have believed that it was compelled by Penelec to hold as it did. I do not think that its view was warranted, and I believe my analysis to be consistent with the terse discussion of the relevant question in the majority opinion in that case. In Penelec, the court held that "the delivery of coal from a mine to a processing station via a conveyor constitutes coal preparation `usually done by the operator of a coal mine.' " 969 F.2d at 1503. Thus, contrary to the Commission's apparent perception, the Penelec court did utilize the "as is usually done" language in its holding. Indeed, it quoted the clause as including "a" instead of "the". Moreover, the Penelec court was not presented with the question whether the statute reaches anyone who performs any listed activity under any circumstances. Rather, the head drives at issue in Penelec moved raw coal to a processing plant where it underwent precisely the type of treatment that would constitute coal preparation in the ordinary sense of the term. Penelec is thus wholly consistent with the view of the "as is usually done" clause as limiting the definition of coal preparation to those activities usually done by the operator of a coal mine as that term is generally understood. In addition, the Penelec court expressly reaffirmed the prior statement in Stroh that "the delivery of completely processed coal to the ultimate consumer" falls outside the statute. Id. at 1504. As I have shown, the Commission's reading of Penelec is inconsistent with that proposition.

IV.

Accordingly, I would hold that the Commission made an error of law in holding that any person who performs any activity listed in § 802(i) under any circumstances is subject to the Mine Act. I would hold, in contrast, that the definition of the "work of preparing the coal" embraces the performance of activities, whether or not listed in § 802(i), only if they are the type of work usually done by a coal mine operator, as that term is commonly understood. I would grant RNS's petition for review and remand to permit the Commission to reevaluate this case under that legal standard. Even if I am wrong and the correct legal standard

20

is, as the majority holds, that any person who performs any listed activity under any circumstances is subject to the Mine Act, so long as he performs such activity on a regular basis, I believe it is perfectly clear that the Commission did not base its decision on that standard. Therefore, even if the majority's view of the law is correct, the proper disposition is a remand under Chenery.6

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

6. In addition to my disagreements with the majority discussed in the text, I also note that the majority fails to explain or support its suggestions that the site might come within the statute as a "custom coal preparation facilit[y]," Maj. Op. at 8, or a "land[ ] . . . resulting from[ ] the work of extracting such minerals from their natural deposits . . . ." Maj. Op. at 8 (quoting 30 U.S.C. § 802(h)(1)).

21