**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4457
_____

SHAMOKIN FILLER COMPANY, INC.,

Petitioner

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW
COMMISSION; SECRETARY OF LABOR, MINE
SAFETY AND HEALTH ADMINISTRATION (MSHA)


Respondents

_____

On Petition for Review from the Federal Mine Safety and
Health Review Commission
(Docket Nos. PENN 2009-775, -825, PENN 2010-63, -191,
-275, -291, -381, -465, -515, -745, PENN 2011-16, -104, -
129, -189)
_____

Argued: December 10, 2013

Before: MCKEE, *Chief Judge*, FUENTES and CHAGARES,
*Circuit Judges*.

(Opinion Filed: July 11, 2014)

Adele L. Abrams, Esq. [ARGUED]
Law Office of Adele L. Abrams, P.C.
4740 Corridor Place, Suite D
Beltsville, MD 20705

*Attorney for Petitioner Shamokin Filler Company Inc.*

Sara L. Johnson, Esq. [ARGUED]
U.S. Department of Labor
1100 Wilson Blvd., 22nd Fl.
Arlington, VA 22209

*Attorney for Respondent-Appellee Secretary of Labor*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

Petitioner Shamokin Filler Company, Inc., operates a coal preparation facility in Shamokin, Pennsylvania that has been regulated by the Federal Mine Safety and Health Administration ("MSHA") since 1977. After a change in ownership in 2009, the new owners challenged MSHA's jurisdiction over the Shamokin facility, contending that the

2

Occupational Safety and Health Administration ("OSHA"), not MSHA, should oversee it.[1] The Secretary of Labor, along with an Administrative Law Judge for the Federal Mine Safety and Health Review Commission, and the same Commission's appellate body, all disagreed and concluded that because Shamokin was engaged in the "work of preparing the coal," as defined in the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. § 802(i), MSHA's assertion of jurisdiction was proper. Shamokin petitions for review of the Commission's final order, arguing that its plant does not engage in the "work of preparing the coal" because it makes its 100% coal products out of already processed coal.

Shamokin's interpretation of the statute lacks any basis in the text of the Mine Act, and we decline to adopt it. Shamokin also requests reversal of an evidentiary determination excluding evidence of MSHA's non-jurisdiction over other plants. We find this evidentiary challenge to be without merit. For the reasons that follow, we will deny the petition for review.

## I. BACKGROUND[2]

---

[1] Presumably the new owners desired to avoid the more stringent requirements imposed by MSHA regulations and the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 *et seq*. As discussed in more detail below, MSHA, rather than OSHA, has much stricter oversight requirements including regarding respirable coal dust standards.

[2] We have jurisdiction over this appeal under 30 U.S.C. § 816(a). The Administrative Law Judge's ("ALJ")

## A. Legal and Administrative Framework

The U.S. Department of Labor oversees, in relevant part, two agencies devoted to workplace safety and worker health: OSHA and MSHA. OSHA administers the Occupational Health and Safety Act of 1970 (the "OSH Act") and regulates workplace safety and worker health unless Congress has conferred jurisdiction on another agency in an industry-specific statute. *See* 29 U.S.C. § 653(b)(1). In this case, OSHA and the OSH Act govern Shamokin's plant unless MSHA, administering the Mine Act, governs instead.

The difference in jurisdiction results in a difference in oversight. MSHA's regulatory framework is more specific and extensive than OSHA's in regulating safety and health hazards associated with the handling of coal, particularly with

---

final decision and order, entered on October 18, 2012, was not directed for review by the Mine Commission and by law became a final order of the Mine Commission on November 26, 2012. We review the Mine Commission's legal conclusions *de novo*. *See Reich v. D.M. Sabia Co.*, 90 F.3d 854, 860 (3d Cir. 1996). We review evidentiary rulings for abuse of discretion. *See Mach Min., LLC v. Sec'y of Labor, Mine Safety & Health Admin.*, 728 F.3d 643, 659 (7th Cir. 2013); *cf. Gunderson v. U.S. Dep't of Labor*, 601 F.3d 1013, 1021 (10th Cir. 2010) (reviewing evidentiary decisions of an ALJ of the Department of Labor's Benefits Review Board under an abuse of discretion standard); *R & B Transp., LLC v. U.S. Dep't of Labor, Admin. Review Bd.*, 618 F.3d 37, 44 (1st Cir. 2010) (same as to decisions of an ALJ of the Department of Labor's Administrative Review Board).

regard to workers' exposure to respirable coal dust. *Compare* 30 C.F.R. Part 71 *with* 29 C.F.R. Part 1910, Subpart Z. Because of the dangers inherent in mining, Congress also gave the Secretary more rigorous enforcement mechanisms under the Mine Act than under the OSH Act. For example, the Mine Act, unlike the OSH Act, requires two inspections per year for surface mines, permits inspections to be conducted without a warrant, and in specified circumstances authorizes inspectors to issue orders requiring withdrawal of miners from the mine. *See* 30 U.S.C. §§ 813(a), 814(d), 814(e), 817(a); *Donovan v. Dewey*, 452 U.S. 594, 606 (1981); *RNS Servs., Inc. v. Sec'y of Labor, Mine Safety & Health Admin. (MSHA)*, 115 F.3d 182, 187 (3d Cir. 1997).

In order to determine whether MSHA and the Mine Act govern, we must decide whether the facility to be regulated is a "coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce." 30 U.S.C. § 803; *see RNS Servs., Inc.*, 115 F.3d at 183. In relevant part, a "coal or other mine" under the Mine Act includes "lands, . . . facilities, equipment, machines, tools, or other property, . . . used in, or to be used in, . . . the work of preparing coal . . . and includes custom coal preparation facilities." 30 U.S.C. § 802(h)(1)-(h)(2). We have found this provision to be "so expansively worded as to indicate an intention on the part of Congress to authorize the Secretary to assert jurisdiction over any lands *integral* to the process of preparing coal for its ultimate consumer." *RNS Servs., Inc.*, 115 F.3d at 186 (emphasis added). The Mine Act defines "the work of preparing the coal" as "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and

5

such other work of preparing such coal as is usually done by the operator of the coal mine." 30 U.S.C. § 802(i).

We employ a "functional analysis" in assessing whether MSHA has jurisdiction, under which we give the "broadest possible scope to [M]ine Act coverage." *Pa. Elec. Co. v. Fed. Mine Safety & Health Review Comm'n ("Penelec")*, 969 F.2d 1501, 1503 (3d Cir. 1992) (quotation marks omitted). What matters most is how the company uses the coal:

> Turning to the case law, in [*Penelec*], we held that "the delivery of raw coal to a coal processing facility is an activity within the Mine Act, but not the delivery of completely processed coal to the ultimate consumer." 969 F.2d 1501 [at 1504] (citing *Stroh v. Director, Office of Workers' Comp. Progs.,* 810 F.2d 61, 64 (3d Cir. 1987)). *See also Hanna v. Director, Office of Workers' Comp. Progs.,* 860 F.2d 88, 92-93 (3d Cir.1988). In *Stroh,* we found that "shovel[ing coal] into [a] truck, and haul[ing] it to independently owned coal processing plants" was integral to the work of preparing the coal. [810 F.2d] at 62. We further noted that the loaded coal's subsequent transportation over public roads did not alter its status as an activity that is part of the work of preparing the coal. *Id.* at 65.
>
> *Penelec* applied a functional analysis, wherein the propriety of Mine Act jurisdiction is determined by the nature of the functions that

occur at a site. That analysis has its roots in *Wisor v. Director, Office of Workers' Comp. Progs.,* 748 F.2d 176, 178 (3d Cir.1984), was applied in *Stroh,* 810 F.2d at 64, and has been adopted by the Fourth Circuit. *See United Energy Servs., Inc. v. Federal Mine Safety & Health Admin.,* 35 F.3d 971, 975 (4th Cir. 1994).

*RNS Servs. Inc.*, 115 F.3d at 184.

### B. Procedural History

Between 1977 and 2009, MSHA treated Shamokin's facility, operated by another owner, as a mine and inspected it for compliance with the Mine Act. In 2009, Shamokin changed ownership. The current owners (children of the former owners) wrote to the Secretary of Labor requesting that MSHA relinquish jurisdiction over the plant. The Secretary refused. Between 2009 and 2011, the Secretary, through MSHA, issued a number of citations against Shamokin for violations of the Mine Act that MSHA inspectors found at Shamokin's plant. Among the most serious of these citations were numerous violations of MSHA's respirable dust standards.

Shamokin contested the citations in front of an ALJ of the Federal Mine Safety and Health Review Commission. Shamokin stipulated that it was liable for the violations and associated penalties to the extent that MSHA appropriately exercised jurisdiction over the plant. However, Shamokin objected to MSHA's jurisdiction, on the grounds that it was not operating a "coal or other mine," but instead was mainly

7

engaged in the manufacture of products made out of coal rather than the preparation of anthracite coal. After an ALJ found that MSHA had jurisdiction, Shamokin appealed to the Mine Commission's appellate body, which affirmed the ALJ.

## C. Factual Findings of the Mine Commission

The facts as found by the Mine Commission are conclusive as Shamokin mounts no argument to show that they are not supported by substantial evidence. *See* 30 U.S.C. § 816(a). The ALJ specifically found that, "the Carbon Plant is a custom coal preparation facility that stores, sizes, dries and loads coal to make it suitable for subsequent industrial use." App. at A25. The ALJ also determined Shamokin's key witness "offered contradictory, inconsistent, and suspect testimony." *Id.* Specifically, there was "an attempt by the owners to obstruct the amount of coal used by the Carbon Plant, the percentage of coal versus non-mined materials, and the actual nature and extent of its coal versus non-coal operations." *Id.* The ALJ determined that Shamokin's assertion that it was principally engaged in manufacturing coal products, rather than coal processing, was belied by the evidence: "over 6,000 tons of [Shamokin's] product, 'carb-o-cite,' made of 100% anthracite coal, was sold in 2009, as compared to only a few tons of multiple products containing no coal or coal mixtures. . . . This Court noted that neither inspector . . . observed any mixing of coal with non-coal materials at the plant." *Id.* at A26. The ALJ concluded that "[Shamokin] is storing large amounts of coal, screening it to remove impurities and ensure size quality, drying it, and loading it in bags appropriately sized to be sold in the stream of commerce." *Id*. at A28. The Mine

8

Commission's appellate body affirmed the ALJ's decision as supported by "substantial evidence." *Id.* at A36.

### D. Conclusions of Law of the Mine Commission

The ALJ determined that "[t]he fact that [Shamokin] is customizing the formulas to meet industry and customer specifications only strengthens the Secretary's position that [Shamokin] is operating a custom coal preparation facility and should, therefore, continue to be covered under MSHA's jurisdiction." *Id.* at A28. The Mine Commission affirmed, concluding that that the ALJ "was correct in concluding that the Carbon Plant performs the 'work of preparing the coal,' and thus is a 'mine' . . . subject to jurisdiction under the Mine Act." *Id.* at A38.

### E. Evidentiary Ruling

The ALJ granted the Secretary's motion seeking to exclude evidence gathered by a 2004 MSHA fact-finding committee that had reviewed operations at seven facilities that Shamokin claimed were similar to its carbon plant. The ALJ first found that the evidence of MSHA's oversight over other facilities was irrelevant because MSHA jurisdiction should be determined on a "case-by-case basis." *Id.* at A2. It also found that, even if it were relevant, it should be excluded because "its probative value [was] . . . substantially outweighed by a danger of unfair prejudice, confusion of the issues, or . . . a waste of time or needless presentation of cumulative evidence." *Id.* (relying on 29 C.F.R. § 2700.63(a), which provides, "relevant evidence, including hearsay evidence, that is not unduly repetitious or cumulative is admissible," and Federal Rule of Evidence 403). The ALJ

9

reasoned that the balance in this case weighed in favor of exclusion given the case-by-case nature of the inquiry over whether MSHA jurisdiction is proper; the fact that it would be "cumbersome and impractical" to review "whether and why MSHA has exercised or should exercise jurisdiction over similar 'bagging facilities'"; and that Shamokin would be not be prejudiced given the otherwise wide breadth of the evidentiary hearing. App. at A2-3.

The ALJ revisited the evidentiary determination after the hearing itself, adding that there was no appellate case law on the question of whether "a comparative facility analysis approach" was proper. *Id*. at A9. Accordingly, the ALJ found that the approach Shamokin requested would detract from analysis of the particular facility at issue, sending the tribunal on a "jurisdictional safari, searching out all similar facilities in the country and comparing alike and non-alike activities, structures, operations, and products with that of the subject Carbon Plant. [] The collateral inquiries would be endless." *Id*. at A10.

The Mine Commission's appellate body affirmed under an abuse of discretion standard, adding that Administrative Procedure Act § 556(d) imposes an obligation on the agency to have a policy to exclude "irrelevant, immaterial, or unduly repetitious evidence." *Id*. at A39 (citing 5 U.S.C. § 556(d)). The Mine Commission agreed that the evidence was not relevant because "[i]t is unlikely that any two facilities would be identical and warrant the same conclusion on jurisdiction," and jurisdiction is "governed by the statute, rather than by which of two conflicting interpretations by the Solicitor is correct." App. at A39 (internal quotation marks and citations omitted). Moreover,

10

given that the evidence was of "limited probative value," its introduction would have "unduly delayed the trial"—Shamokin would have had to present "a significant number of additional witnesses" to "demonstrate the similarities between those facilities and its Carbon Plant." *Id.* at A40. Finally, the appellate body noted that MSHA has asserted jurisdiction over Shamokin's plant for decades, and that there has been no change in Shamokin's operations. *Id.*

## II. DISCUSSION

### A. 30 U.S.C. § 802: "work of preparing the coal"

Under our functional analysis, Shomakin is engaged in "the work of preparing the coal." In *RNS*, the loading of coal for transport to another facility for further processing was considered "the work of preparing the coal," because the "storage and loading of the coal is a critical step in the processing of minerals extracted from the earth in preparation for their receipt by an end-user, and the Mine Act was intended to reach all such activities." 115 F.3d at 185. Shamokin does more than the facility in *RNS*: Shamokin admits that it stores, dries, screens, and bags coal. Under *RNS*, it is subject to MSHA jurisdiction.

Shamokin nonetheless argues that it is not engaged in the work of preparing coal under the Mine Act definition because it purchases coal that has already been processed. Shamokin supports its argument in four ways worth addressing: first, through statutory interpretation, second, through relying on a definition of "coal preparation" from the now defunct U.S. Bureau of Mines, third, by arguing that the statute would lack meaningful boundaries without its

11

proposed limitation, and finally, by relying on case law from various Courts of Appeals. Each argument will be addressed in turn.

Shamokin first makes a statutory argument. It contends that the last phrase in § 802(i), "and such other work of preparing such coal as is usually done by the operator of the coal mine," modifies the earlier items in the list such that only functions that are usually done by the "operator of *a* coal mine" are regulated under the Mine Act. Petitioner's Br. at 13 (emphasis added). In turn, only processing of "raw," "run-of-mill" or unprepared coal, not the processing of coal that is already in "usable or marketable condition," would usually be done by an operator of a coal mine. *Id.* The Secretary responds that the Mine Act contains no such limitation.

We believe the Secretary is correct. The words "raw" or "unprepared" or "run-of-mill" never appear anywhere in the Mine Act definitions, a strong indication that Congress never restricted Mine Act coverage to those facilities that begin with coal in these states. Additionally, in *RNS*, we addressed the last phrase in § 802(i), and rejected the predicate of the argument that Shamokin raises here— whether the activities at the plant are usually done by the operator of *a hypothetical* coal mine is not relevant in the analysis. In *RNS*, we placed emphasis on the definite article in the phrase "as is usually done by the operator of *the* coal mine." 115 F.3d at 185 (emphasis added) (internal quotation marks omitted). We decided that if 802(i) had an indefinite article in place of the definite article, reading instead "the operator of *a* coal mine," this clause could imply that "one might have to compare the activities at the alleged coal mine with those of a typical, paradigmatic, 'usual' coal mine." *RNS*

12

*Servs. Inc.*, 115 F.3d at 185. However, the sentence as written differs. It "simply explains that the work of the coal mine is the work that is usually done in that particular place. The fact that [a] [s]ite is perhaps an unconventional coal mine does not defeat its status as a coal mine for the purposes of [§] 802." *Id.* Shamokin's statutory argument is therefore without merit.

Shamokin's second argument borrows from the *Dictionary of Mining, Mineral and Related Terms* published by the U.S. Bureau of Mines, a now defunct federal agency that conducted scientific research on the extraction, processing, use, and conservation of mineral resources until its closure in 1995. The Bureau had defined "coal preparation" as "[t]he various physical and mechanical processes in which *raw* coal is dedusted, graded, and treated by dry methods (rarely) or water methods, using dense-media separation (sink-float), jigs, tables, and flotation. The objective is the removal of free dirt, sulfur, and other undesirable constituents."[3] This definition is at least eighteen years old and is from an agency that was tasked not with safety but rather research. In any event, the words "raw coal" do not appear in the Mine Act, and Shamokin has failed to show why this definition should take precedence over the one in the Mine Act.

Third, Shamokin asserts that unless the work of preparing coal ends "when the raw, run-of-mill extracted material has been processed into a usable condition," the list

---

[3] *Available at*
http://webharvest.gov/peth04/20041015011634/imcg.wr.usgs.gov/dmmrt/ (last accessed June 30, 2014) (emphasis added).

13

of activities enumerated in § 802(i) would be unworkably broad. Petitioner's Br. at 14. Such an interpretation, the argument runs, could include "anyone who handles coal, no matter how far down the stream of commerce," subsuming non-mining activities such as operations "that use processed coal for heating, powering equipment, as a feedstock in producing other products, or which merely transport the processed coal." *Id.* at 14-15. But this Court's functional approach has already managed to weed out such activities. For example, without Shamokin's proposed limitation, we determined that delivery of raw coal to a processing facility, but not delivery of processed coal to the consumer, counts as the work of preparing the coal. *See RNS Servs., Inc.*, 115 F.3d at 184. In *RNS*, the loading of coal for transport to another facility for further processing was considered "the work of preparing the coal" because the "storage and loading of the coal is a critical step in the processing of minerals extracted from the earth in preparation for their receipt by an end-user, and the Mine Act was intended to reach all such activities." *Id.* at 185. Thus, through the rubric of the functional test, activities that are too far attenuated from the actual processing of coal, and which are not "critical" or "integral," *see id.* at 185-86, in preparation of receipt by the end user, will not be subsumed under the Mine Act definition and in fact have not been.

Contrary to Shamokin's assertion, our opinion in *Dowd v. Director, Office of Workers' Compensation Programs*, 846 F.2d 193, 194-195 (3d Cir. 1988) does not counsel in favor of another result. [4] In *Dowd*, we determined

---

[4] *Dowd* is of limited import here because it was decided under Title IV of the Mine Act, or the Black Lung Benefits Act of

14

that a worker was involved in the preparation of coal at a "custom coal preparation facility" because his employer dried and crushed "unprepared anthracite [coal]." *Id.* at 195. Shamokin asks us to extrapolate from this that the work of further preparing prepared coal would thus not be considered coal preparation. In so doing, it requests that we convert a sufficient condition into a necessary one, but nothing about the opinion implies that the facilities have to *begin* with unprepared anthracite to be "custom coal preparation facilities."

Finally, Shamokin attempts to demonstrate that courts routinely cut off Mine Act jurisdiction at the point where raw coal becomes usable. Having reviewed the cases cited, we agree with the Secretary that none of these cases stands for the proposition that the Mine Act does not cover the further processing of already processed coal.[5]

---

1972 ("BLBA"), 30 U.S.C. § 901 *et seq.*, for which Congress has specified that a different definition of coal mine applies. *Compare* 30 U.S.C. § 802(h)(2) (defining "coal mine" for purposes, among others, of subchapter IV of chapter 22, which includes the BLBA), *with* 30 U.S.C. § 802(h)(1) (defining "coal or other mine" for the rest of chapter 22, which includes the Mine Act).

[5] See Petitioner's Br. at 16-18 (citing *Southard v. Dir., OWCP*, 732 F.2d 66, 68-70 (6th Cir. 1984) (finding under the BLBA that a worker who stored, loaded, and unloaded coal for a coal retailer was not engaged in the "work of preparing the coal" because the coal retailers he worked for were "purchasers of prepared coal"); *Eplion v. Dir., OWCP*, 794 F.2d 935, 937 (4th Cir. 1986) (finding under the BLBA that a

It is also worth noting that Shamokin's most serious mine safety citations involved violations of MSHA's respirable dust standards. Given that the activities at Shamokin's plant trigger the types of safety concerns that the Mine Act was intended to remedy, it would defy Congress's intent to allow Shamokin to escape Mine Act jurisdiction based on a formality. *See RNS Servs., Inc.*, 115 F.3d at 187 (noting that the Mine Commission had "legitimate concerns about worker safety and health at the Site," which included "[t]rue potential hazards" such as "circulation of dust").

Thus, we decline Shamokin's invitation to impose additional limitations not in the statute and find that MSHA's assertion of jurisdiction over the plant was proper.

---

worker who transported and distributed processed coal was not engaged in the "work of preparing the coal" because the coal was "already processed and prepared for market before [the worker] had any contact with it"); *Collins v. Dir., OWCP*, 795 F.2d 368, 372 (4th Cir. 1986) (finding under the BLBA that a truck driver who hauled slate (coal refuse) from the "tipple" at the end of processing was not engaged in coal mine employment)). In fact, we have before *declined* to impose a bright line rule that preparation ends "at the point when the coal is placed into the processing tipple because we are not convinced that each step essential to the preparation of the coal for entry into the stream of commerce is completed at that point. Thus, [the employer's] participation in the removal of the coal from the tipple was a step, if only the very last step, in the preparation of the coal." *Hanna v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 860 F.2d 88, 93 (3d Cir. 1988) (looking with skepticism on *Collins*, 795 F.2d at 372, relied on by Shamokin).

16

## B. Evidentiary Appeal

Shamokin also challenges the ALJ's decision to exclude evidence of MSHA's non-assertion of jurisdiction over plants that Shamokin claims are its competitors. Shamokin contends that the evidence would have showed an inconsistent position regarding MSHA's exercise of jurisdiction over carbon products plants such as Shamokin's, which could call into question the propriety of the Secretary's assertion of jurisdiction here.

Shamokin submits that a number of memoranda are relevant to the question of whether MSHA has consistently interpreted the statute to allow for jurisdiction over the further processing of non-raw coal. In its brief, Shamokin discusses only the operations of the Keystone Filler & Manufacturing plant, highlighting a June 22, 2004 memorandum as representative, so that is the plant and memorandum we will address. According to this memorandum, written by Counsel for Standards, Mine Safety and Health, to a District Manager of MSHA, Keystone's facility was not engaged in the "work of preparing the coal" because,

> once the coal arrives at this facility, it is already fully prepared and ready to be used by Keystone as a chemical compound ingredient in the manufacture of saleable products for the rubber, plastics, and steel products industries. . . . Other ingredients are added to it such as coke, petroleum laced coke and graphite. Any oversized pieces are crushed at Keystone, but this crushing is incidental to the manufacturing process. As a consumer of fully processed coal

17

> sold in the open market, Keystone's work constitutes manufacturing rather than mining, and as such, not subject to MSHA jurisdiction. . . . [P]reparation ends when the coal is ready for use.

App. at A184.

We agree that the consistency of an agency's application of a statute might be relevant. *See, e.g.*, *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473 F.3d 1239, 1243 (D.C. Cir. 2007) ("The Order under review is arbitrary and capricious in that it provides no basis in fact or in logic for the Commission's refusal to treat Westar as it had treated KCPL."). However, this memorandum is not relevant. Keystone was engaged in manufacturing, not coal processing. Shamokin argued unsuccessfully to the Mine Commission that it, like Keystone, was mainly engaged in the manufacture of carbon-based products for the steel, rubber, and plastics industries. The Mine Commission determined this assertion was factually without merit, as inspectors found no mixing of coal with non-coal materials at the plant, and the records supplied by Shamokin confirmed that it sold only a few tons of products containing no coal or coal mixtures. As such, Shamokin's comparison to Keystone is not apt, as Shamokin was mainly engaged in coal processing, not manufacturing of other products using coal.

Furthermore, as the Mine Commission pointed out, better evidence on the consistency of MSHA's jurisdictional decisions is the fact that the Secretary through MSHA has asserted jurisdiction over Shamokin from 1977 to 2009 without a change in its operations when the new owners

18

assumed the helm. Indeed, this demonstrates that the Secretary has *consistently* interpreted the statute. We also agree with the ALJ's assessment that the introduction of this evidence could have opened up a stream of requests for comparisons to facilities all around the country, causing an unnecessary delay in the proceedings to address collateral matters.

Given the limited probative value of the evidence, and the potential it had to unnecessarily delay the hearing, we affirm the Mine Commission's decision to exclude the evidence of MSHA's non-assertion of jurisdiction over other facilities. We find that the agency's decision was not an abuse of discretion. *Cf. Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir. 1990); *see also United States v. Long*, 574 F.2d 761, 767 (3d Cir. 1978) ("If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal.").

### III. CONCLUSION

For the foregoing reasons, we will deny the Petition for Review of the Mine Commission's final order. The Secretary's exercise of jurisdiction over Shamokin through MSHA was proper. Furthermore, the ALJ did not commit an abuse of discretion by failing to allow into evidence internal memoranda between MSHA employees regarding the non-assertion of jurisdiction over other facilities.