994 F.Supp. 1147 (1998)
Alexis M. HERMAN, Secretary of Labor, Plaintiff,
v.
ASSOCIATED ELECTRIC COOPERATIVE, INC., Defendant.
No. 2:97CV39-DJS.
United States District Court, E.D. Missouri, Northern Division.
February 18, 1998.
*1148 Margaret A. Miller, Edward Falkowski, U.S. Dept. of Labor, Denver, CO, for Plaintiff.
Eugene E. Andereck, Rodric A. Widger, Andereck & Evans, Springfield, MO, for Defendant.

*1149 ORDER

The Secretary of Labor brings the instant action pursuant to 30 U.S.C. § 818(a) of the Federal Mine Safety and Health Act of 1977 ("Mine Act") seeking an injunction forbidding defendant from denying the Secretary's representatives entrance to and inspection of defendant's facility known as Thomas Hill Energy Center. Section 813 of Title 30 authorizes the Secretary to make warrantless inspections of "coal or other mines" for certain enumerated purposes. See also Donovan v. Dewey, 452 U.S. 594, 602, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). The Secretary's complaint alleges that on June 23, 1997, defendant unlawfully denied Federal Mine Inspector Larry Maloney entrance to the Thomas Hill Energy Center preparation plant. In its answer and counterclaim, defendant denies that the power production facilities at the Thomas Hill Energy Center constitute a "mine" or perform the "work of preparing coal" so as to be subject to the Mine Act, and seeks a declaratory judgment consonant with its view. The parties have agreed to submit plaintiff's motion for preliminary injunction to the Court on briefs and stipulated facts. Also before the Court is the Secretary's motion to dismiss defendant's counterclaim for lack of subject matter jurisdiction.
Because the motion to dismiss the counterclaim raises issues concerning the Court's jurisdiction generally, the Court will first address that motion. The Secretary seeks dismissal of the counterclaim on the ground that the Mine Act allows the Secretary to seek relief in the district courts, see 30 U.S.C. § 818(a), but requires an employer to seek relief from the Federal Mine Safety and Health Review Commission, subject to review by a Court of Appeals, see §§ 815 and 816. The Supreme Court has upheld what appears to be the plain reading of this statutory scheme:
The Act expressly authorizes district court jurisdiction in only two provisions, §§ 818(a) and 820(j), which respectively empower the Secretary to enjoin habitual violations of health and safety standards and to coerce payment of civil penalties. Mine operators enjoy no corresponding right but are to complain to the Commission and then to the court of appeals. Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 209, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (emphasis in original). The Court therefore readily concludes that it lacks jurisdiction over defendant's counterclaim for a declaratory judgment, which will be dismissed.
In any event, the same substantive issue is presented by both the complaint and the counterclaim. The Secretary indicates in her memorandum in support of the motion to dismiss that defendant has initiated administrative review of the validity of the citation issued to defendant for its refusal to permit MSHA inspection. An administrative law judge therefore has the same issue pending before him as is raised by the Secretary's complaint in this Court. Defendant's opposition to the motion to dismiss suggests that this Court should altogether defer to the administrative review pursuant to the doctrine of primary administrative jurisdiction.
The Court concludes that no such deferral is necessary or warranted in this case.
The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties... "Primary jurisdiction" ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.
United States v. Western Pacific Railroad Co., 352 U.S. 59, 63-64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The purposes to be served by the rule are decisional uniformity and maximizing the benefit of the specialized expertise of regulatory agencies. Id. 352 U.S. at 64. "In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." Id.
*1150 As further discussed below, the issue before the Court requires a legal determination to be made on stipulated facts, and is in the Court's view a determination largely controlled by precedent of both the Commission and Courts of Appeals. In these circumstances, the exercise of jurisdiction by this Court neither threatens the uniformity of decisions on the subject, nor treads on areas of particular administrative expertise. Furthermore, as noted above, the Court's jurisdiction over the Secretary's complaint for injunctive relief is expressly provided for in the regulatory scheme: "[t]he judge-made doctrine of primary jurisdiction comes into play when a court and an administrative agency have concurrent jurisdiction over the same matter, and no statutory provision co-ordinates the work of the court and of the agency." Mercury Motor Express, Inc. v. Brinke, 475 F.2d 1086, 1091 (5th Cir.1973). Upon careful consideration, then, the Court deems this matter inappropriate for application of the primary jurisdiction principle.
In connection with the preliminary injunction motion, the parties have stipulated to the following facts which the Court deems relevant to its determination.

Stipulated Facts
1. Associated Electric Cooperative, Inc. ("AECI") was incorporated in 1961 for the primary propose of providing a reliable supply of electric power to its six transmission cooperative owners.
2. AECI owns, operates and maintains three electric power generating units or plants (collectively referred to as "the power plant") at a facility known as the Thomas Hill Energy Center, near the town of Clifton Hill, in Randolph County, Missouri. The units were placed in service in 1966, 1969, and 1982.
3. Before 1993, the three electric generating units were fueled with coal extracted and prepared at a surface mine adjacent to the power plant.
4. In January, 1994, AECI began to receive sub-bituminous coal from two mines located in the Powder River Basin in the State of Wyoming. These mines are the Rochelle Mine (MSHA Mine Identification No. 48-01353), located in Campbell County, Wyoming, and the North Antelope Mine (MSHA Mine Identification No. 48-01375), also located in Campbell County, Wyoming. Both mines are operated by the Powder River Coal Company, a subsidiary of Peabody Holding Company.
5. Coal extracted at the Powder River mines is crushed before shipment to a size such that the largest pieces of coal will pass through a 2½ inch hole. No further crushing or sizing or other form of preparation is done to the coal before it is shipped from the mines. The coal does not pass under magnets, before shipment, to remove trash metal from the coal. The mines are projected to mine about 60,000,000 tons of coal during 1997. Due to its low ash and sulfur content, this coal does not require cleaning or washing to remove these impurities. The crushed coal is shipped to approximately 50 industrial, commercial and utility customers at 65 different locations. The Rochelle Mine and the North Antelope Mine have been regularly inspected by MSHA's Gillette, Wyoming field office (within MSHA's Coal District 9, headquartered in Denver, Colorado) since the mines were opened in 1983 (North Antelope Mine) and 1985 (Rochelle Mine).
6. The coal from the Rochelle Mine and the North Antelope Mine is classified as "Class III, Group 3, Sub-bituminous C" coal within the meaning of the ASTM D388 coal classification standard. AECI converted its generating units and other facilities and contracted for rail cars to receive and use this class of fuel as part of a plan to comply with requirements of the Clean Air Act as amended in 1990.
7. Initially the Wyoming coal was delivered to the power plant in trucks that were loaded at the rail siding about fifteen (15) miles from the power plant. In September, 1994, AECI began to receive direct coal deliveries to the power plant by rail system built into the plant premises. A rotary car dump is used to tip the cars over to unload an average of six unit trains per week. A unit train is normally comprised of about 115 cars, each car carrying approximately 120 tons of coal. About 83,000 tons of coal are delivered each week to the power plant.
*1151 8. The coal received by AECI does not pass over or through any of the mine facilities and equipment previously operated by AECI's Mining Division. The fuel does not enter any working areas of the Mining Division that were inspected by MSHA prior to 1996.
9. Upon arrival from Wyoming, each trainload of coal passes through the "Car Dumper Building" where coal is dumped into hoppers one carload at a time. At the top of each hopper a "grizzly", or grate, removes large clumps of coal or other material that could block the hopper chutes.
10. Two of the power plant's three generating units  Unit No. 1 and Unit No. 2  require 1/4-inch or less diameter coal. The coal is reduced to this size by two hammer mills that are housed in a building separate from the power generation building. Coal burned in the remaining unit, Unit No. 3, is crushed into a powder (capable of passing through a 200 mesh screen) after it reaches the power generation building, by pulverizers located in the power generation building. Exhibit 1 to this order illustrates the path the coal takes from the Car Dumper Building to each of the three power generating units.
11. From the dump hoppers located in the Car Dumper Building, the coal is fed onto conveyor # 28, which takes the coal to the Sample Building. In the Sample Building, the coal passes under the first of several magnets installed in the conveyor system to remove any scrap metal from the coal. It is important to detect and remove any metal debris such as tools, bulldozer bucket teeth, railroad spikes, etc., so that other equipment used later in the operation, e.g., coal crackers, crushers, pulverizers, and burner units, is not damaged. The Sample Building is primarily used as a structure where coal flow is transferred from one conveyor to another. It is called the "Sample Building" because provisions were made for future installation of automatic sampling equipment if needed. Actual sampling is done on a limited basis in the power plant, just before coal is placed in silos, to verify BTU, ash, and sulfur content in compliance with applicable emission standards. By contract, the primary sampling is done in laboratories at the Wyoming mines.
12. Some of the coal that enters the Sample Building from the Car Dumper Building must be diverted, via belt # 29, to a coal storage pile because, as train cars are unloaded, coal enters the Sample Building faster than it can be conveyed "downstream" toward the power generating units. When train cars are not being unloaded, coal from the coal storage pile is fed back onto conveyor # 28 and again enters the Sample Building.
13. After moving through the Sample Building, the coal is transported via conveyor # 30 to Transfer House No. 3(T3). Here again, the coal passes under another magnet before being fed onto conveyors # 32 and # 31A to Transfer House No. 1(T1). T1 contains two more magnets that protect coal from T3 and from the "yard reclaim" (i.e., collected dust and/or spillage), before the coal is directed from T1 into one of two different directions.
14. Final coal preparation for burning is tailored for the requirements of the individual generating units, as follows:

A. Thomas Hill Units 1 and 2.

I. Coal that is to be used in the No. 1 and 2 power generating units is transported out of Transfer House No. 1 on conveyor # 31B. The coal passes under another magnet, and then is dumped into the "Units 1 and 2 Track Hoppers". From the Track Hoppers the coal is fed onto either conveyor # 1A or # 1B, which then dump the coal onto ready piles. From the ready piles, the coal travels on either conveyor #2A or # 2B to Units 1 and 2 Crusher House.
ii. Thomas Hill Units 1 and 2 are called cyclone boilers. The coal must be crushed from the 2½ inch size delivered by the Rochelle Mine and North Antelope Mine to a 1/4-inch size. The Crusher House has two Pennsylvania hammer mill crushers which were recently updated  from the existing models originally installed in 1966  to larger units. Their purpose is to crush the coal to cyclone burner size of 1/4-inch for Units 1 and 2. The coal is then fed onto conveyors # 3A and # 3B for transport to the Unit 1 and 2 plant storage *1152 silos located in the power generation building.

B. Thomas Hill Unit 3.

I. The Thomas Hill Unit 3 is called a pulverized coal boiler. Coal that is to be used in the No. 3 power generating unit is directed onto conveyors # 33A and # 33B, transported out of Transfer House No. 1 and dumped onto ready piles. From the ready piles, the coal is fed through coal crackers and then is dumped onto conveyors # 37 and # 38. Coal crackers are breakers used to break larger chunks of coal into smaller sizes. These crackers can be turned on and off, and are normally used to break up clumps of frozen coal from the outdoor ready piles. Conveyors # 37 and # 38 then carry the coal to Transfer House No. 2(T2).
ii. In Transfer House No. 2, the coal passes under magnets, and then is fed into a granulator (ring crusher) to ensure that its size is about 1½ to 2 inches. Once through the granulator, the coal passes one last time under magnets before dropping onto conveyors # 39 and # 40 (and then onto # 41 and # 42), for transport to the Unit No. 3 storage silos in the generation building. Although in the past the granulator in T2 was used primarily in the winter to break up frozen chunks of coal, it is now being utilized regularly to provide a more consistent size of coal for feeding into the pulverizers for the No. 3 Unit.
iii. The coal burned in Unit 3 must be pulverized to a consistency like face powder. It has to be reduced in size so that 74 percent of the coal will pass through a 200 U.S. Standard Sieve. The pulverizers for Unit 3 are located in the power generation building.
15. In September 1995, the Occupational and Health Administration (OSHA) office in Kansas City, Missouri, received a complaint from an employee of AECI's Thomas Hill Energy Center. The complaint alleged, among other things, that employees were exposed to the hazard of breathing coal dust that is created when railroad cars are unloaded; that employees are exposed to the hazard of fire and explosion from coal dust suspended in the air in belt tunnels; and that employees are exposed to the hazards of fire and explosion from accumulated coal and coal dust in the Track Hopper feeder and #1A and # 1B conveyor belt tunnels.
16. In response to the complaint an OSHA inspector conducted an inspection of the facilities. Air samples were taken and analyzed. Some time after the OSHA inspector's site visit, OSHA reported to the AECI Plant Safety Coordinator that the matter was being referred to MSHA to resolve a question of possible MSHA jurisdiction under the Mine Safety and Health Act (the "Act"). OSHA referred the matter to the MSHA office in Hillsboro, Illinois.
17. Prior to the referral, it was the MSHA District office's practice not to conduct inspections of coal fired electric generating facilities where the only known processing of coal  i.e. crushing or pulverizing  was done to facilitate the combustion process. Accordingly, as a result of the referral from OSHA, the District Manager for MSHA in Vincennes, Indiana, sought legal advice from MSHA's National office concerning MSHA's jurisdiction at the power plant.
18. In the course of MSHA's jurisdictional determination, on August 5, 1996, MSHA Inspector Larry G. Maloney visited the Thomas Hill Energy Center to view the activities that were being conducted at the site. After reviewing the information submitted, MSHA headquarters concluded that MSHA had jurisdiction at the facility over all areas (including unloading, storage, and preparation areas) from the point at which the coal is unloaded from the train cars to the locations where coal is dumped onto conveyors 3A, 3B, 39, and 40, for transport into the power generation building.
19. Subsequently, the District Manager for MSHA's District 8, Coal Mine Safety and Health, and the Regional Administrator for OSHA's Kansas City Regional Office, executed a Jurisdictional Determination regarding the coal handling activities at the Thomas Hill Energy Center, providing that MSHA jurisdiction extends to "All areas and buildings from where the coal arrives at the rotary dump until the prepared coal from the Crusher House and Transfer House No. 2 is dumped onto conveyors 3A and 3B, and 39 *1153 and 40 for transport to the power generating building."
20. In late March, 1997, MSHA informed AECI of its jurisdictional determination and offered to meet with the company. In June 1997 MSHA again offered to meet with the company for the purpose of discussing the requirements of the Mine Act and its regulations. AECI declined to meet with MSHA, and informed MSHA that it disagreed with MSHA's jurisdictional determination and that it would not permit MSHA to inspect the Thomas Hill Power Plant coal handling facilities.
21. On June 23, 1997, MSHA Inspector Larry G. Maloney traveled to the Thomas Hill Energy Center to conduct an inspection of those areas which MSHA asserted were within MSHA's jurisdiction. Inspector Maloney identified himself to Jerry Pinegar, Plant Manager. Mr. Pinegar refused to allow entry to Inspector Maloney for the purpose conducting an MSHA inspection. Inspector Maloney then issued, pursuant to section 104(a) of the Act (30 U.S.C. 814(a)), MSHA citation No. 4264782, alleging a violation of section 103(a) of the Act (30 U.S.C. 813(a)), and gave the facility 30 minutes to abate the alleged violation. Mr. Pinegar continued to refuse to allow the inspection, so Inspector Maloney issued order No. 4264783 pursuant to section 104(b) of the Act (30 U.S.C. 814(b)), and then returned to his office in Kirksville, Missouri.

Conclusions of Law
The Court's determination turns on its construction, and application to the undisputed facts, of several definitions in the Mine Act. In view of the apparent lack of any dispute of material fact and the issue of law for the Court, the Court deems it appropriate to advance the determination on the merits and to consolidate consideration of the preliminary and permanent injunctions pursuant to Fed.R.Civ.P. 65(a)(2). See also Agee Agricultural Equipment Sales v. Trail King Industries, 800 F.2d 789, 792 n. 2 (8th Cir. 1986); United States ex rel. Goldman v. Meredith, 596 F.2d 1353, 1358 (8th Cir.1979). There exists no indication in the record that additional evidence or argument is necessary to the ultimate disposition of the case.
On a related threshold matter, defendant argues that plaintiff is unable to demonstrate a threat of irreparable harm as is required to support issuance of a preliminary injunction. The Court's advancement of consideration of the full merits of the case and consolidation of the preliminary and permanent injunction proceedings moot this contention. In any event, the Court would reject the argument in view of the statutory provision for injunctive relief under which the Secretary brings the action: "It is a well-established rule that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction." Burlington Northern Railroad Company v. Bair, 957 F.2d 599, 601-02 (8th Cir.1992); Atchison, Topeka & Santa Fe Railway Co. v. Lennen, 640 F.2d 255, 259-60 (10th Cir.1981). Returning to consideration of the merits of the case, the Court need not and does not further address the factors ordinarily considered in the preliminary injunction context. See Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 112 (8th Cir.1981).
Section 803 of Title 30 provides that: "Each coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such mine shall be subject to the provisions of this chapter." In pertinent part, the term "coal or other mine" is defined in § 802(h)(1)(C) to include:
lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property ... used in, or to be used in ... the work of preparing coal or other minerals, and includes custom coal preparation facilities.
The "work of preparing coal" is defined as "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine." § 802(I). The Court is called upon to determine whether defendant's handling of coal in connection with its generation of electrical *1154 power constitutes the "work of preparing coal" within the meaning of this statutory definition.
In United Energy Services, Inc. v. MSHA, 35 F.3d 971 (4th Cir.1994), the Fourth Circuit considered the application of the Mine Act to a power plant which generates electrical power by burning coal waste. The court held that the conveyor belt system used to transport coal about the plant, and to size it for burning, constituted structures, equipment and machines used in the "work of preparing coal" within the meaning of § 802(h)(1) and (I). Id. at 975. The Fourth Circuit rejected as irrelevant to the analysis the operator's argument that the coal was not prepared for release into the chain of commerce but instead ultimately used internally:
The statute sets forth a functional analysis, not one turning on the identity of the consumer, and United Energy's activities meet the functional test. Although delivery of coal to a consumer after it is processed usually does not fall under the coverage of the Mine Act, United Energy's activities occur a step earlier in the overall process. They involve the transportation of coal to the preparation facility and thus are part of the "work of preparing coal."
Id.
The Third Circuit reached a similar result in Pennsylvania Electric Company v. Federal Mine Safety and Health Review Commission, 969 F.2d 1501 (3rd Cir.1992). The electric company received raw coal from adjacent mines. After reaching the power plant, the raw coal was sized and cleaned. The court held that the electric company's "conveyer head drives constitute the `work of preparing coal,'" because "the delivery of coal from a mine to a processing station via a conveyor constitutes coal preparation `usually done by the operator of a coal mine.'" Id. at 1503. See also RNS Services, Inc. v. Secretary of Labor, 115 F.3d 182 (3rd Cir.1997).
The Federal Mine Safety and Health Review Commission has similarly construed the statutory definition of "work of preparing coal." In Secretary of Labor v. Westwood Energy Properties, 11 FMSHRC 2408, 1989 WL 433698 (F.M.S.H.R.C.1989), the Commission concluded that Westwood's transportation, magnetic cleaning, and crushing to resize coal, all to ready the coal for combustion to generate electricity, were subject to the jurisdiction of the Mine Safety and Health Administration under the Mine Act:
We conclude that Westwood literally engages in the "work of preparing the coal" in that the processes undertaken by Westwood on the mine waste material, including coal, are among those specified in the statutory definition. We further conclude that although Westwood does not undertake to prepare the coal contained in the mine refuse to meet market specifications, it does engage in the enumerated processes, as does the normal coal mine operator, for the purpose of making the mined material suitable for a particular use; here, as a fuel to be consumed at an electric generating facility.
Id. at 2415. See also Air Products and Chemicals, Inc. v. Secretary of Labor, 15 FMSHRC 2428, 2431, 1993 WL 525480 (F.M.S.H.R.C.1993).
As stipulated by the parties, defendant's handling of coal includes moving the coal by means of an extensive conveyor system, magnetically cleaning the coal to remove scrap metal, storing coal, and cracking and crushing coal to reduce its size. Each of these activities is among those enumerated in the statutory definition of the "work of preparing coal," or those cited in the unanimous precedent discussed above. These activities therefore support a determination that defendant's handling of coal falls within the Mine Act, and the Court concludes that the areas from the point at which the coal is unloaded from the train cars to the locations where coal is dumped onto conveyors 3A, 3B, 39 and 40 for transport into the power generation building are within the statutory jurisdiction of the Federal Mine Safety and Health Administration. In the Court's view, the earlier historical division of jurisdiction between the Mine Safety and Health Administration and the Occupational Safety and Health Administration with respect to the Thomas Hill Energy Center and the once-adjacent mine is irrelevant to the legal determination, as is whether MSHA exercises jurisdiction over other generating plants in the region.
In her memoranda, the Secretary responds to an argument that the sub-bituminous *1155 coal processed by defendant falls outside the statutory definition, which refers to "bituminous coal, lignite, or anthracite." The Court's review of defendant's memoranda does not reveal the assertion of any such argument. In any event, the Court agrees with the Secretary that the statutory language is intended not as an exclusive list but as indicating inclusion of all forms of coal along the spectrum from bituminous coal to anthracite. See Pltf. Supp. Memo. [Doc. # 29], pp. 10-14. Furthermore, in RNS Services, 115 F.3d at 186, the Third Circuit rejected a challenge to the application of the Mine Act based on the relative impurity of "coal refuse" processed for burning to generate electricity: "the statute gives no indication that it is concerned only with coal in forms that are pure or nearly so." To the contrary, the Mine Act "regulates `coal or other mines,' so it plainly is not concerned solely with traditional coal." Id., quoting 30 U.S.C. § 802(h)(1).
Exhibit 6 to the parties's stipulation of facts is a videotape containing a narrated tour of defendant's movement of coal through its plant. The scope and capacity of this system yields substantial concerns, acknowledged and addressed in the taped tour, of dust suppression and fire and explosion hazards. These dangers, highlighted in the employee complaint which precipitated the dispute now before the Court, see ¶ 15 infra, p. 12, are among those which the Mine Act was implemented to address. See 30 U.S.C. § 801. Although not directly bearing on the Court's analysis, these observations suggest that the application of the Mine Act to the coal moving and processing portions of defendant's plant is consistent with the purposes for which the Mine Act was enacted. In addition, in view of the health and safety policies underlying the Act, the legislative history of the Mine Act instructs that it is intended to be broadly construed:
[I]t is the Committee's intention that what is considered to be a mine and to be regulated under this Act be given the broadest possible interpretation, and it is the intent of this Committee that doubts be resolved in favor of inclusion of a facility within the coverage of the Act.
S.Rep.No. 181, 95th Cong., 1st Sess. 1, 14, reprinted in 1977 U.S.C.C.A.N. 3401, 3414.
In conclusion, the Court determines as a matter of law, based on the undisputed material facts, that those portions of defendant's plant through which coal is transported and processed to readiness for burning, as shown on Exhibit 1 attached hereto, namely all areas and buildings from the point at which the coal is unloaded using the Rotary Car Dumper to the locations in the Crusher House and Transfer House # 2 where coal is dumped onto conveyors 3A, 3B, 39 and 40 for transport into the power generation building, are within the statutory jurisdiction of the Federal Mine Safety and Health Administration. The Court will therefore grant the Secretary's motion for preliminary injunction and, based upon the Court's consolidation of the preliminary injunction with consideration of the merits, enter summary judgment in favor of the Secretary, granting her the injunction sought in her complaint.
Accordingly,
IT IS HEREBY ORDERED that plaintiff's motion for preliminary injunction [Doc. # 2] is granted.
IT IS FURTHER ORDERED that plaintiff's motion for leave to file supplemental reply memorandum out of time [Doc. # 32] is denied as moot in view of the supplemental reply memorandum timely received and filed on February 6, 1998.
IT IS FURTHER ORDERED that plaintiff's motion to dismiss counterclaim for lack of subject matter jurisdiction [Doc. # 16] is granted.
*1156