# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————————

No. 98-1876

————————

| | | |
|---|---|---|
| Alexis M. Herman, Secretary of Labor; | * | |
| Department of Labor, | * | |
| | * | |
| Appellees, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Missouri. |
| | * | |
| Associated Electric Cooperative, Inc., | * | |
| | * | |
| Appellant. | * | |

————————

Submitted:  December 14, 1998

Filed: April 20, 1999

————————

Before FAGG, HEANEY, and WOLLMAN, Circuit Judges.

————————

WOLLMAN, Circuit Judge.

Associated Electric Cooperative, Inc. (Associated) appeals from the district court's order granting summary judgment in favor of the Secretary of Labor and permanently enjoining Associated from excluding inspectors of the Mine Safety and Health Administration (MSHA) from its power-generating facility.  Because we conclude that Associated is not a "mine" within the meaning of the Federal Mine Safety and Health Act, 30 U.S.C. §§ 801-962 (Mine Act), we reverse.

**I.**

Associated operates the Thomas Hill Energy Center, a three-unit, coal-fired electric power generating facility in Randolph County, Missouri. The facility obtains its coal from two mines in the Powder River Basin in Wyoming. Before shipment, the mines crush the coal into pieces approximately 2.5 inches in size. The coal is then shipped to the facility by rail. Associated engages in various preparation activities before burning the coal for electricity. All coal passes through grates to sift out large debris and under magnets to remove scrap metal. For one generator unit, coal is crushed into powder with pulverizers. For the other two units, coal is broken into quarter-inch pieces with hammer mills. Associated also performs sampling to ensure that the coal complies with emission standards.

In September 1995, the federal Occupational Safety and Health Administration (OSHA) received a complaint about coal dust from an employee at the facility. An OSHA inspector visited the facility and took air samples. Subsequently, OSHA informed Associated that it was referring the matter to MSHA to determine which agency had jurisdiction to inspect the facility's coal processing operations. An MSHA inspector visited the facility in August 1996. MSHA informed Associated in March 1997 that it had jurisdiction over the coal processing activities, from the point where coal is unloaded from railroad cars until it is ready for combustion.

On June 23, 1997, an MSHA inspector attempted to complete a formal inspection of the facility's coal processing operations. Associated denied the inspector entrance to the facility. MSHA issued Associated a citation under section 813(a) of the Mine Act for refusing to allow the inspector entrance. Associated continued to deny MSHA entrance to the facility, whereupon the Secretary brought this suit to enjoin Associated from denying MSHA entrance.

After finding that it had subject matter jurisdiction to determine whether Associated is a "mine" within the meaning of the Mine Act, the district court found

that Associated qualified as a mine because of its coal processing activities. The court then issued a permanent injunction requiring Associated to grant MSHA inspectors access to the facility.

## II.

Initially, Associated claims that the district court did not have subject matter jurisdiction to determine its status as a "mine" under the Mine Act. Because the parties do not dispute the underlying facts, we review the court's determination of subject matter jurisdiction de novo. See United States v. Lawrence, 51 F.3d 150, 151-52 (8th Cir. 1995) (reviewing a determination of subject matter jurisdiction de novo); Drevlow v. Lutheran Church, Missouri Synod, 991 F.2d 468, 470 (8th Cir. 1993) (same).

According to Associated, the Mine Act only confers federal jurisdiction in cases involving "'habitual' offenders of the regulatory scheme" of the Act. See Appellant's Br. at 8 (quoting Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 209 (1994)). Undoubtedly, the Mine Act confers federal jurisdiction when the Secretary believes that a mine operator "is engaged in a pattern of violation of the mandatory health or safety standards" of the Act. 30 U.S.C. § 818(a)(2). Associated overlooks the significance of section 818(a)(1), however, which provides for federal jurisdiction in many other cases, including when a mine operator "refuses to admit [MSHA] representatives to the . . . mine." Id. § 818(a)(1)(C).

The Supreme Court has recognized that the Mine Act confers federal jurisdiction when any triggering event under section 818(a)(1) occurs. See Donovan v. Dewey, 452 U.S. 594, 604-05 (1981) (stating that section 818(a) would confer federal jurisdiction when a mine operator denies an MSHA inspector access to a facility). The Third Circuit has asserted subject matter jurisdiction in a case strikingly similar to the present one. In Marshall v. Stoudt's Ferry Preparation Co., an operator

-3-

claimed that its facility was not a "mine" within the meaning of the Mine Act and denied entrance to an MSHA inspector. 602 F.2d 589, 590 (3d Cir. 1979). The Third Circuit held that the facility qualified as a mine under the Act and enjoined the operator from denying MSHA inspectors access to the facility. Id. at 592.

Interpreting the Mine Act to confer federal jurisdiction only when operators habitually violate the Act would render section 818(a)(1) nugatory. This would contradict fundamental principles of statutory construction. See United States v. Talley, 16 F.3d 972, 975-76 (8th Cir. 1994) (citing Moskal v. United States, 498 U.S. 103, 109-10 (1990)) (holding that whenever possible, statutes should be construed to give effect to all of their clauses and words). Accordingly, we conclude that the district court had subject matter jurisdiction over this case under section 818(a)(1)(C).

## III.

Associated also asserts that it is not a mine within the meaning of the Mine Act. We review the district court's construction of the term "mine" in the Act de novo. See United Energy Servs., Inc. v. Federal Mine Safety & Health Admin., 35 F.3d 971, 974 (4th Cir. 1994); Bush & Burchett, Inc. v. Reich, 117 F.3d 932, 935-36 (6th Cir.), cert. denied, 118 S. Ct. 46 (1997).

The Act provides:

> "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form . . . , (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property . . . used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits . . . [or in] the milling of such minerals, or the work of

preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1).  The Act goes on to define "the work of preparing coal" as "breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine." Id. § 802(i).  The issue before us is whether a utility company that performs some of these tasks on previously processed coal is a mine under the Act.

In adopting the Mine Act, "Congress was plainly aware that the mining industry is among the most hazardous in the country." Dewey, 452 U.S. at 602. Therefore, it designed the Act to "improv[e] the health and safety conditions in the Nation's underground and surface mines." Id.  The statute expressly declares, "[I]t is the purpose of this chapter . . . to protect the health and safety of the Nation's coal or other miners."  30 U.S.C. § 801(g).  See also Thunder Basin, 510 U.S. at 209-10 (discussing Congress's purpose for adopting the Act).

To achieve these goals, Congress intended that "what is considered to be a mine and to be regulated under this Act be given the broadest possibl[e] interpretation."  S. Rep. No. 95-181, at 14 (1977), reprinted in 1977 U.S.C.C.A.N. 3401, 3414; see also Bush & Burchett, 117 F.3d at 936-37 (stating that the word "mine" should be construed broadly due to the remedial nature of the Act); RNS Servs., Inc. v. Secretary of Labor, 115 F.3d 182, 187 (3d Cir. 1997) (same); United Energy, 35 F.3d at 975 (same); Donovan v. Carolina Stalite Co., 734 F.2d 1547, 1553-54 (D.C. Cir. 1984) (same).  The remedial nature of the Mine Act does not allow courts to extend its coverage without limit, however.  "It is clear that every company whose business brings it into contact with minerals is not to be classified as a mine within the meaning of section [802](h)." Carolina Stalite, 734 F.2d at 1551;

see also Pennsylvania Elec. Co. v. Federal Mine Safety & Health Review Comm'n, 969 F.2d 1501, 1510 (3d Cir. 1992) (Mansmann, Circuit Judge, dissenting).

In Old Dominion Power Co. v. Donovan, the Secretary attempted to assert MSHA jurisdiction over a utility that sold electricity to a mine and periodically entered mine property to read the meter. See 772 F.2d 92, 93-94 (4th Cir. 1985). The Fourth Circuit found no MSHA jurisdiction because Congress did not intend all independent contractors that work at a mine to be considered "mine operators" under the Act. Id. at 96-97. Similarly, in Bush & Burchett the Secretary asserted MSHA jurisdiction over a bridge that a mine built to accommodate its traffic on a state highway between the mine and a loading facility on a nearby river. See 117 F.3d at 933. The Sixth Circuit held that MSHA did not have jurisdiction over the bridge because it was dedicated to the state highway system for public use. According to the court, "without some limitation on the meaning of 'roads appurtenant to,' MSHA jurisdiction could conceivably extend to unfathomable lengths." Id. at 937.

Likewise, not all businesses that perform tasks listed under "the work of preparing coal" in section 802(i) can be considered mines. The Act was designed primarily to protect miners, not employees of coal purchasers such as electric utilities and steel mills. See Pennsylvania Electric, 969 at 1510 (Mansmann, Circuit Judge, dissenting) (quoting Secretary of Labor v. Pennsylvania Elec. Co., 11 FMSHRC 1875, 1889-90 (1989) (Doyle, Comm'r, dissenting)); see also S. Rep. No. 95-461, at 37 (1977) (stating that the Act was meant to regulate "mining activity"). Although Associated performs some coal processing operations listed in section 802(i), its employees are not "miners," even in the broadest sense of the word. "[I]nherent in the determination of whether an operation properly is classified as 'mining' is an inquiry not only into whether the operation performs one or more of the listed work activities, but also into the nature of the operation performing such activities." Secretary of Labor v. Elam, 4 FMSHRC 5, 7 (1982).

The Secretary relies on decisions of the Mine Safety and Health Review Commission that subject utilities to MSHA jurisdiction. Such decisions, while instructive, are not binding. Further, they can be distinguished from the present case. In <u>Secretary of Labor v. United Energy</u>, the Commission held that a utility located adjacent to a mine was itself operating as a mine because it maintained a conveyor system to transport coal refuse from the mine and performed all processing activities needed to make the refuse a marketable product. <u>See</u> 15 FMSHRC 2022, 2058 (1993). Similarly, in <u>Pennsylvania Electric</u>, the Commission subjected a utility to MSHA jurisdiction because it operated a conveyor that transported run-of-mine, or unprocessed, coal from a mine to a separately-owned custom coal preparation facility located on the utility's property. <u>See</u> 11 FMSHRC at 1880. In that case, the Secretary did not attempt to assert MSHA jurisdiction beyond the custom coal preparation facility. <u>Id.</u> at 1876. <u>See also</u> <u>Secretary of Labor v. Alexander Bros., Inc.</u>, 4 FMSHRC 541, 545 (1982) (subjecting an operator to MSHA jurisdiction because it performed all processing tasks necessary to convert refuse into marketable coal); <u>Secretary of Labor v. Westwood Energy Properties</u>, 11 FMSHRC 2408, 2413-14 (1989) (same); <u>Air Prods. & Chems., Inc. v. Secretary of Labor</u>, 15 FMSHRC 2428, 2429-31 (1993) (same).

The Commission decisions subjecting utilities to MSHA jurisdiction thus fall into two categories: (1) where the utility maintains a presence at a mine to assist in transporting coal to its generating facility, and (2) where the utility performs all processing tasks necessary to convert coal refuse into a marketable product. Circuit court decisions subjecting utilities to MSHA jurisdiction can be similarly categorized. <u>See</u> <u>RNS</u>, 115 F.3d at 185 (utility performed all processing tasks on coal refuse); <u>United Energy</u>, 35 F.3d at 973 (utility maintained conveyor system at mine and processed coal waste into marketable coal); <u>Pennsylvania Electric</u>, 969 F.2d at 1503 (utility maintained conveyor system to transport run-of-mine coal from adjacent mines). In essence, after a mine delivers processed, marketable coal to a utility any further operations to prepare the coal for combustion are not subject to MSHA

jurisdiction. See United Energy, 35 F.3d at 975 (holding that "delivery of coal to a consumer after it is processed usually does not fall under the coverage of the Mine Act").

In the present case, Associated purchased coal that was processed into a marketable form by the mine.[1] Associated did not participate in transporting the coal from the mine, nor were its processing activities necessary to make the coal marketable. Therefore, its coal-handling operations are more properly characterized as "manufacturing" than "mining." While MSHA may have expertise in regulating the hazards of coal dust, Congress designed the Mine Act primarily to protect miners. The Secretary cannot claim that Associated's employees are miners. If Congress wishes to expand the Act to cover consumers of coal such as utilities and steel mills, it is better suited to that task than this court. We simply hold that under the current version of the Mine Act, a utility that receives processed coal from a mine does not itself become a "mine" by further processing the coal for combustion.

Associated's coal processing operations remain subject to OSHA jurisdiction. See 29 C.F.R. §§ 1910.269(a)(1)(i)(B)(1) (stating that OSHA regulations apply to coal-handling installations at utility companies), 1910.269(v)(11)(xii) (requiring utilities to eliminate or control coal dust). Indeed, in prior cases the Secretary has asserted that MSHA has a "policy of inspecting those areas of a power plant that involve the handling and processing of run-of-mine coal and of leaving to OSHA the inspection of those areas that involve the handling of previously processed coal." See Pennsylvania Electric, 11 FMSHRC at 1884, cited in Westwood, 11 FMSHRC at 2417. Extending MSHA jurisdiction to the coal-handling operations in the present case would result in needless confusion for utility workers about whether MSHA or OSHA regulations apply to their conduct. "Requiring electric utility employees

_____

[1]The mine sold its coal to approximately 50 industrial, commercial, and utility customers. See Stipulated Facts ¶ 12, J.A. at 87.

suddenly to adhere to conflicting standards depending on their job location can only lead to danger, especially where work around high voltage is involved." Old Dominion, 772 F.2d at 99.

The judgment of the district court is reversed, and the case is remanded with instructions to dismiss the Secretary's request for preliminary and permanent injunctions.

HEANEY, Circuit Judge, dissenting.

I agree that the district court had subject matter jurisdiction under § 818(a)(1)(C) but would join the Secretary of Labor and the district court in holding that Congress unambiguously conferred jurisdiction upon MSHA to ensure worker safety at coal-processing operations like those present at Thomas Hill. Accordingly, I respectfully dissent.

Associated receives approximately 83,000 tons of coal each week from two mines located in the Powder River Basin of Wyoming. The coal from these mines is crushed before shipment to a size such that the largest pieces of coal will pass through a 2½ inch hole. No further crushing, sizing, or other preparation occurs.

When a train carrying coal arrives at Thomas Hill, it is directed to the Car Dumper Building where the coal is unloaded into hoppers one carload at a time. At the top of each hopper is a "grizzly," or grate, which removes large clumps of coal or other material that could block the hopper chutes. The coal travels by conveyor belt to the Sample Building, where it passes under magnets to remove scrap metal. Next, it travels by conveyor to Transfer House No. 3, and then to Transfer House No. 1, both of which also contain magnets.

At Transfer House No. 1, the coal is divided into two parts. Coal to be burned in Power Generating Units Nos. 1 and 2 moves by a series of conveyor belts to the Units Nos. 1 and 2 Track Hoppers, to ready piles, and then to the Units Nos. 1 and 2 Crusher House. The crusher house crushes the coal into the 1/4 inch pieces required for the Thomas Hill Units Nos. 1 and 2 Cyclone Boilers. After crushing, the coal is fed onto Conveyors Nos. 3A and 3B for transport to the Units Nos. 1 and 2 Plant Storage Silos located in the power generation building. Coal to be burned in Generating Unit No. 3 is transported by conveyor from Transfer House No. 1 to ready piles, and is then fed through coal crackers to break up large clumps of coal. Next, it travels by conveyor to Transfer House No. 2, where it passes under magnets and through a granulator (ring crusher) to reduce its diameter to 1½ to 2 inches. Finally, the coal is dumped onto Conveyors Nos. 39 and 40 for transport to the Unit No. 3 Storage Silos in the power generation building. The coal for Unit No. 3 (a pulverized coal boiler) is ground to a powder in the power generation building.

In September 1995, the Kansas City OSHA office received a complaint from an Associated employee alleging exposure to health (inhalation) and safety (fire and explosion) hazards from the presence of coal dust in several of the coal-processing areas described above. After an onsite visit by an OSHA inspector revealed the extensive nature of the coal processing operations at the Thomas Hill facility, OSHA referred the matter to MSHA to assist in determining which agency had jurisdiction over the coal-processing operation. To resolve that question, a MSHA inspector visited Thomas Hill. The inspector submitted a report to the national MSHA office which, after receiving a legal opinion by the Office of the Solicitor, determined that MSHA had jurisdiction over all areas of the Thomas Hill facility having to do with coal, including unloading, storage, and preparation areas. This determination delineating their respective jurisdictions over the Thomas Hill operations was memorialized in a June 1997 document signed by an OSHA Regional Administrator and an MSHA district manager. Associated declined to meet with MSHA, notified

MSHA that it disagreed with the jurisdictional determination, and refused to permit MSHA to inspect the Thomas Hill coal-processing operation.

On June 23, 1997, a MSHA inspector went to Thomas Hill to conduct an inspection but was denied entry. The inspector issued a citation to Associated for refusing to allow the inspection and, subsequently, an order was issued based on Associated's refusal to abate the original violation. On July 3, 1997, the Secretary filed this action in federal district court. On July 16, 1997, Associated contested MSHA's citation and order before the Federal Mine Safety and Health Review Commission (Commission).[2] In its February 18, 1998 decision, the district court noted that Associated's coal-handling activities as stipulated by the parties included "moving the coal by means of an extensive conveyor system, magnetically cleaning the coal to remove scrap metal, storing coal, and cracking and crushing coal to reduce its size." Herman v. Associated Elec. Corp., 994 F. Supp. 1147, 154 (E.D. Mo. 1998). On this basis, the court concluded that "the areas from the point at which the coal is unloaded from the train cars to the locations where coal is dumped onto conveyors 3A, 3B, 39 and 40 for transport into the power generation building are within the statutory jurisdiction of the [MSHA]." Id. Accordingly, the district court entered summary judgment in favor of the Secretary, granting preliminary and permanent injunctions prohibiting Associated from refusing to permit MSHA inspections of the specified portions of the Thomas Hill.

Initially, I believe that the Secretary's determination that MSHA has jurisdiction over the Thomas Hill coal-processing operation is entitled to judicial deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Even if our review is de novo, however, the Mine Act clearly

---

[2]On April 10, 1998, a Commission ALJ issued a decision dismissing Associated's case based on the collateral estoppel effect of the district court's February 18, 1998 decision.

applies to the Thomas Hill coal-processing operation. The Mine Act applies to "[e]ach coal or other mine, the products of which enter . . . or . . . affect commerce." 30 U.S.C. § 803 (1998). The Mine Act defines "coal or other mine" to include not only lands and equipment associated with the extraction of coal and other minerals, but also "lands . . . structures, facilities, equipment, machines, tools, or other property . . . used in, or to be used in . . . the work of preparing coal or other minerals, and includes custom coal preparation facilities." 30 U.S.C. § 802(h)(1)(C) (1998). Mine Act coverage is to be given the "broadest possible" scope, Pennsylvania Elec. Co. v. Federal Mine Safety & Health Review Comm'n, 969 F.2d 1501, 1503 (3d. Cir. 1992), and the statute "was intended to provide a 'sweeping definition' of the word 'mine,' encompassing much more than the usual meaning attributed to it." Bush & Burchett, Inc. v. Reich, 117 F.3d 932, 936 (6th Cir. 1997) (quoting Donovan v. Carolina Stalite Co., 734 F.2d 1547, 1551 (D.C. Cir. 1984)). The question before us, therefore, is whether Thomas Hill is a "facilit[y] . . . used in . . . the work of preparing coal," and/or whether it is a custom coal preparation facility.[3]

While the Mine Act does not define "custom coal preparation facility," it defines the "work of preparing coal" as "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine." 30 U.S.C. § 802(i) (1998). It is uncontested that Associated engages in most, if not all, of the activities enumerated in § 802(i). Accordingly, the Thomas Hill coal-processing operation falls under the plain meaning of § 802(i).

---

[3]It is not clear whether this is a single inquiry. Because that determination does not affect my conclusion that the Mine Act applies to the Thomas Hill coal-processing operation, I do not differentiate between what may, in fact, be two separate inquiries.

This conclusion is further supported by the legislative history of the Mine Act. The House Conference Report states:

> Both the Senate bill and the House amendment broadly defined mine to include all underground or surface areas from which the mineral is extracted, and *all surface facilities used in preparing or processing the minerals*, as well as roads, structures, dams, impoundments, tailing ponds and like facilities related to the mining activity.

H.R. Conf. Rep. No. 95-655, at 38 (1977), reprinted in 1977 U.S.C.C.A.N. 3485, 3486 (emphasis added). The Senate Report acknowledges that "there may be a need to resolve jurisdictional conflicts," and in resolving this conflict, "what is considered to be a mine and to be regulated under this Act [should] be given the broadest possibl[e] interpretation, and . . . *doubts [should] be resolved in favor of inclusion of a facility within the coverage of the Act*." S. Rep. No. 95-181, at 14 (1977), reprinted in 1977 U.S.C.C.A.N. 3401, 3414 (emphasis added). Moreover, the Act's definition provisions are to be construed broadly so as to effectuate the statutory purpose of preserving the safety of mining operations. To the extent that there is doubt as to whether the Mine Act applies to Thomas Hill's coal-processing operation, Congress has directed that all doubts be resolved in favor of finding MSHA jurisdiction.

The majority contends that the Mine Act does not apply for two reasons. First, the Mine Act was passed to protect "miners" and Associated's coal-processing employees are not miners. Second, the Thomas Hill coal-processing operation was more akin to "manufacturing" than "mining." Neither distinction is persuasive or even on point.

Certainly, Congress designed the Mine Act to protect the health of miners. Just as clearly, Congress gave a broad definition of the facilities to be covered by the act. Thus, just as we must construe broadly the definition of "mine," so must we broadly construe the meaning of "miner" to give effect to Congress' clear intent to protect

workers from the unique dangers posed by working in substantial coal-processing operations.

While the majority does not provide a definition of "miner," I would define a miner as a worker engaged in substantial coal-processing activities enumerated in § 802(i). Under such a definition, Associated employees who engage in coal processing at Thomas Hill would be covered by the Mine Act. Quite obviously, MSHA has the expertise, experience, and equipment to guarantee the safety of workers who are involved in coal-processing operations like those present in this case. This expertise is made clear by the fact that OSHA referred the Thomas Hill investigation to MSHA. Moreover, MSHA's regulatory framework in areas such as coal dust standards; sampling procedures; respiratory equipment; and structural, equipment, mechanical, and electrical safety in coal-processing facilities is much more extensive than the OSHA regulatory framework set forth by the majority. See 30 C.F.R. §§ 70.100-70.305; 77.203-77.217; 77.400-77.411; 77.500-77.516 (1998).

In this light, the majority's reliance on Old Dominion Power Co. v. Donovan, 772 F.2d 92 (4th Cir. 1985) is inapposite. In that case, the Fourth Circuit was asked to interpret the Mine Act's definition of "operator," defined by the statute to mean "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine." 30 U.S.C. § 802(d) (1998). The issue in Old Dominion was whether a utility company that provided electricity to a mine, did not perform any maintenance at the mine's substation, including on the lines thereto, and whose actions were limited to installing equipment to measure voltage and amperage for its meter, maintaining the meter, and sending workers to the meter once a month and ensuring that the meter was functioning properly fell within this definition. See 772 F.2d at 93. The issue arose when a utility worker was injured. See id. After analyzing § 802(d), the Fourth Circuit determined that "Congress intended to include within the Mine Act's definition of 'operator' only those independent contractors who are involved in mine

-14-

construction or extraction and who have a 'continuing presence' at the mine." Id. at 96. While we are not called upon to interpret § 802(d) in this case, insofar as there is an analogy, I agree with the Fourth Circuit that the *extent* to which an employee is involved in coal processing determines whether a particular employee is an intended beneficiary of Mine Act protection.[4] To that end, a meter reader is factually distinguishable from a coal-processor. Unlike Associated's coal-processing employees, the utility workers in Old Dominion were on the mine's premises for the limited purpose of checking a meter. Here, Associated's employees are engaged in substantial coal-processing operations that bring it within the plain language and express purpose of the Act's coverage.

The majority additionally asserts that utility workers will suffer confusion if the Mine Act were to apply to the Thomas Hill coal-processing operation. In its submissions to the district court, the Secretary of Labor included a 1979 Interagency Agreement between MSHA and OSHA. As part of the agreement, "MSHA and OSHA will endeavor to develop compatible safety and health standards, regulations, and policies with respect to the mutual goals of the two organizations including joint rulemaking, where appropriate. This interagency coordination may also include cooperative training, shared use of facilities, and technical assistance." (Ex. 9 at 5.) The Secretary of Labor also submitted to the district court 1995 OSHA guidelines for enforcing 29 C.F.R. § 1910.269:

---

[4]Similarly inapposite is the majority's reliance on Bush & Buchett, 117 F.3d at 932. The majority confuses the facts and claims that "the Secretary [of Labor] asserted MSHA jurisdiction over a bridge that a mine built to accommodate its traffic on a state highway between the mine and a loading facility on a nearby river." The issue in Bush & Burchett was whether the construction company that built the bridge was properly cited under OSHA regulations. See 117 F.3d at 933. While Bush & Burchett involved a question of MSHA jurisdiction over the construction site, the construction company, not the Secretary, argued that MSHA had jurisdiction. See id. In fact, both OSHA and MSHA determined that MSHA lacked jurisdiction. See id. at 935.

> The requirements in 1910.269 are intended to apply to conditions and installations for which MSHA does not in fact "exercise statutory authority . . . ." MSHA's jurisdiction relative to power generation plants covers the processing of coal prior to final transport of the coal into the power generation building (where the coal is burned). Processing includes activities such as mixing, breaking, crushing, sizing, washing, and mechanically assisted drying. The location of these activities whether on or off the property owned or leased by the power generation company is not an issue.

(Ex. 10 at 7.) This interagency agreement eliminates any confusion that might have existed without it.

The majority also misses the point by attempting to characterize the Thomas Hill coal-processing operation as manufacturing. By its terms, the Mine Act applies to the Thomas Hill coal-processing operation if Associated engages in "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine." 30 U.S.C. § 802(i) (1998). In employing a functional analysis of the Thomas Hill coal-processing operation, the dispositive issue cannot be a matter of geography or the fact that the coal processor is also the end user. Rather, it must be the *extent and type of processing* that determines whether the Mine Act applies.

In 1982, the Federal Mine Safety and Health Review Commission recognized this principle and outlined the basic framework for determining whether a particular coal-processing operation is subject to MSHA jurisdiction, stating that "inherent in the determination of whether an operation properly is classified as 'mining' is an inquiry not only into whether the operation performs one or more of the listed work activities, but also into the *nature* of the operation performing such activities." Secretary of Labor v. Elam, 4 FMSHRC 5, 7 (1982). The Commission also stated that the "'work of preparing coal' connotes a process, usually performed by the mine

operator engaged in the extraction of the coal or by custom preparation facilities, undertaken to make coal suitable for a particular use or to meet market specifications." Id. at 8. This reasoning supports the conclusion that location and ownership are secondary to the nature of the processing that occurs at the facility.

The Fourth Circuit has also recognized the absurdity of limiting MSHA jurisdiction to a commercial inquiry:

> We think it irrelevant that United Energy is transporting and delivering the coal to the power plant it operates, rather than to another consumer of coal. *The statute sets forth a functional analysis, not one turning on the identity of the consumer*, and United Energy's activities meet the functional test. Although delivery of coal to a consumer after it is processed usually does not fall under the coverage of the Mine Act, United Energy's activities occur a step earlier in the overall process. They involve the transportation of coal to the preparation facility and thus are part of the "work of preparing coal."

United Energy Servs., Inc. v. Federal Mine Safety & Health Admin., 35 F.3d 971, 975 (4th Cir. 1994) (emphasis added); see also RNS Servs., Inc. v. Secretary of Labor, 115 F.3d 182, 184 (3d Cir. 1997) (adopting functional analysis).

That a power plant is the end user of coal it substantially processes is no answer to whether the Mine Act applies.[5] In Air Products & Chemicals, Inc. v.

_____

[5]Clearly not every end user of coal is subject to the Mine Act. Here, however, the plain language of the statute indicates the Mine Act's applicability to the substantial coal processing conducted at Thomas Hill. Simply characterizing the coal purchased by Associated as "marketable" is no answer to the question of whether the Thomas Hill coal-processing operation constitutes "preparation" within the meaning of the statute. To the extent that marketability affects the determination of whether the Mine Act applies, the fact that Associated substantially processes the coal it receives indicates that marketability is a relative concept. In any event, a functional approach must involve a deeper inquiry than the identity of the consumer and whether the coal has undergone some previous minimal processing.

Secretary of Labor, a power plant processed bituminous coal refuse and "run-of-mine" coal that was delivered by truck. See 15 FMSHRC 2428, 2429 (1993). The refuse and coal was screened, sized, crushed, and stored until it was fed into boilers to produce electricity and steam. See id. The Commission held that the coal processing constituted the "work of preparing coal." Id. at 2431.

The Commission also rejected the end-user theory in Secretary of Labor v. Westwood Energy Properties, concluding that the Mine Act applied to a culm bank operation, in which culm (anthracite coal mining waste) was screened and crushed to the specifications required by Westwood's electric generation facility. See 11 FMSHRC 2408, 2412-15 (1989); see also Secretary of Labor v. Pennsylvania Electric Co., 11 FMSHRC 1875, 1879-82 (1989) (concluding that the Mine Act applied to conveyor head drives used to transport coal at an electric generation facility). The Third Circuit affirmed this analysis in the Pennsylvania Electric case, stating that "the conveyor transports the coal to the coal-processing station. At the station the coal is broken, crushed, sized, washed, cleaned, dried, and blended in order to make a 'useable coal product' for the electric generating facility." Pennsylvania Elec. Co., 969 F.2d at 1503. The court concluded that "the delivery of coal from a mine to a processing station via a conveyor constitutes coal preparation 'usually done by the operator of a coal mine.'" Id. (citing 30 U.S.C. § 802(i)).

That the coal is extracted elsewhere is no answer to whether the Mine Act applies. The Third Circuit has stated that the definition of mine "is so expansively worded as to indicate an intention on the part of Congress to authorize the Secretary to assert jurisdiction over any lands *integral to the process of preparing coal for its ultimate consumer.*" RNS Servs., Inc., 115 F.3d at 186 (emphasis added). It can hardly be disputed that Thomas Hill is integral to the process of preparing coal for its ultimate use. Recognizing the absurdity of limiting MSHA jurisdiction to a geographical inquiry, the Third Circuit noted that "the delivery of raw coal to a coal processing facility is an activity within the Mine Act, but not the delivery of

*completely* processed coal to the ultimate consumer." Pennsylvania Elec. Co., 969 F.2d at 1504 (citing Stroh v. Director, OWCP, 810 F.2d 63, 64 (3d Cir. 1987) (emphasis added)). Associated significantly processes the coal it purchases. Thus, it cannot be said that it receives *completely* processed coal. Accordingly, the applicability of the Mine Act does not cease once the coal is loaded in Wyoming, in transit, or even when Associated takes possession of it. The proper inquiry must focus on both the nature and extent of Thomas Hill's coal-processing operation.

Not only does the majority choose to disregard Congress' clear mandate, it subjects the Thomas Hill coal-processing operation to a cursory, incomplete, and legally unfounded functional analysis. Instead of examining the facts in light of congressional definitions, the majority substitutes its own sense that the word "mine" must be defined narrowly for Congress' clear direction that it be defined broadly and in conformity to the statutory definitions. As noted above, Associated processes approximately 83,000 tons of coal each week. The coal it receives has only been sized so that it will pass through a 2½ inch hole. No further crushing, sizing, or other form of preparation is done to the coal before it is shipped from the mines. Moreover, the coal does not pass under magnets before shipment to remove trash metal from the coal. Considering the relatively unprocessed form in which Associated receives the coal and the substantial processing it must therefore perform itself, the majority errs by focusing on the fact that a commercial transaction and geography separate the Thomas Hill coal-processing operation from the site of coal extraction. Based on the majority's logic, once raw coal is extracted and shipped to an end user, the Mine Act would not apply to *any* subsequent coal processing–irrespective of the nature or extent of processing. This is plainly at odds with the functional analysis mandated by Congress.

Finally, I agree that Congress is best suited to articulate the breadth of MSHA jurisdiction. Unlike the majority, however, I am unwilling to disregard Congress' clear mandate to resolve doubts in favor of MSHA jurisdiction and the Supreme

Court's clear mandate to defer to the Secretary of Labor's reasonable interpretation of a statute. Not only is the majority's conclusion unsupported by the law, I fear that it will unnecessarily endanger the health and lives of coal-processing workers. For the reasons stated above, I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.